IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-CR-46 (LMB) |
| ELEVIEW INTERNATIONAL INC., | |
| OLEG NAYANDIN, AND | |
| VITALIY BORISENKO, | |
| Defendants. | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

Within weeks of Russia's invasion of Ukraine, Special Agents from the Department of Commerce warned the defendants about the new export-control laws related to Russia and provided them with resources to remain compliant. Oleg Nayandin assured the Special Agents that he and Vitaliy Borisenko, who together had over 30 years of experience in the export business, were well-versed with export control laws and were aware of the new sanctions. But instead of heeding the Special Agents' guidance—or federal law—the defendants opted to violate the Export Control Reform Act through various international transshipment schemes so they could continue to profit from selling to Russian customers.

Over the course of approximately seventeen months, the defendants repeatedly and systematically violated the law through dozens of false statements and illegal shipments. In Nayandin's case, he additionally attempted to obstruct justice by providing a document he knew to be false directly to the Special Agent investigating his company. The defendants had multiple opportunities to stop their illegal conduct, including when the Special Agents conducted a second outreach to warn Borisenko that any transshipment of goods to Russia was illegal. But the

defendants' illegal exports continued for *months*.    In total, the defendants illegally exported 157 shipments, totaling a reported value of over $6.1 million.

The danger of defendants' conduct is real.    While some of the dual-use goods the defendants exported to Russia were lower-level consumer goods, they also exported items with significant military uses.    Once these goods left the United States, the government was powerless to stop these goods from being used in their military applications, which is why it is imperative that exporters like the defendants abide by the export control laws.    Through defendants' schemes, they exported *hundreds* of dual-use goods to Russia.    These items included hundreds of controlled telecommunications devices that the defendants exported to a Russian telecommunications company with ties to Russia's internal security and intelligence agency.    The Russian military can use this telecommunications equipment to create and expand its communication networks.    And, in one example, the defendants exported an ethernet transceiver that can be used in one of Russia's exploding drones.

The defendants' brazen and extensive violations of the law and callous disregard for the consequences of their actions require a serious sentence.    The government respectfully submits that terms of incarceration of 70 months for Oleg Nayandin and 37 months for Vitaliy Borisenko, along with a three-year term of supervision for each, provide a sufficient sentence, but not one greater than necessary, to fulfill the purposes under 18 U.S.C. § 3553(a)(2).

## BACKGROUND

## I.    Background on the Defendants[1]

Eleview International Inc. provides freight-forwarding for customers in the Russian

---

[1]  The defendants' Statement of Facts, and the description of the offensive conduct in their respective Presentence Investigation Reports, were predominantly similar.    The government cites here to Nayandin's PSR, unless otherwise noted.

Federation ("Russia").   ECF No. 75 ¶ 20 ("Nayandin PSR").   Through Eleview's website, BuyUSA.ru, and its connections with Russia-based businesses, Eleview used its Chantilly, Virginia warehouse to consolidate packages and reduce its customers' shipping costs from the United States to Russia.   *Id*.   Using Eleview's website, Russian customers could order U.S. products from U.S. sellers—many of whom would not ship to Russia—and have the products sent to Eleview's warehouse, where Eleview would repackage them for forwarding to Russia.   *Id*.

Oleg Nayandin, a first-generation U.S. citizen from Kazakhstan, is the owner, CEO, and President of Eleview, where he has worked since 2001.   *Id*. ¶¶ 22, 94.   As CEO, Nayandin is responsible for all of Eleview's operations. *Id*. ¶ 59.

Vitaliy Borisenko, likewise a first-generation U.S. citizen, worked at Eleview since he graduated from college in 2009.   ECF No. 73 ¶ 92 ("Borisenko PSR").   At Eleview, Borisenko led the day-to-day operations of its warehouse in Chantilly and Eleview's freight-forwarding business.   *Id*. ¶ 22.

## II.    The Russia Sanctions

When Russia launched its full-scale invasion of Ukraine in February 2022, the United States—and specifically the Commerce Department's Bureau of Industry and Security ("BIS")—responded by implementing a series of stringent export controls to protect U.S. national security and foreign policy interests by restricting Russia's access to equipment and technologies needed to sustain its war effort. *See, e.g.*, 87 Fed. Reg. 12,226 (Mar. 3, 2022); 87 Fed. Reg. 12,856 (Mar. 8, 2022); 87 Fed. Reg. 57,068, 57,068 (Sept. 16, 2022) (collectively, the EAR Russia Sanctions). The EAR Russia Sanctions, which were later expanded, added new license requirements and licensing policies, including expanded prohibitions on the export, reexport, or in-country transfer of, among other things, telecommunications and information security equipment to or within

Russia without a license, and a general licensing policy of denial (with limited exceptions) for such transactions.

In issuing the Russia Sanctions, the Commerce Department noted, "[t]he export control measures implemented in this final rule *protect U.S. national security* and foreign policy interests by restricting Russia's access to items that it needs to project power and fulfill its strategic ambitions." 87 Fed. Reg. 12,226 (Mar. 3, 2022) (emphasis added).

As of April 8, 2022, a BIS license was required to export, reexport, or transfer to or within Russia any item on the Commerce Department's list of the most sensitive items subject to its controls, called the Commerce Control List ("CCL"), which are categorized by Export Control Classification Number ("ECCN"). *See* 87 Fed. Reg. 1226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8. In other words, subject to minor exceptions, if a shipment to Russia occurred after April 8, 2022, and any good in that shipment had an ECCN, then the exporter was required to get a license for each good with an ECCN before it could be exported to Russia.

An exporter generally is required to file Electronic Export Information ("EEI") with the U.S. government where, among other reasons, an export license is required, the value of the commodity being exported is more than $2,500, or items on the CCL (regardless of value) are being exported. 15 C.F.R. § 758.1. The EEI requires an exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address (if any), and a description of the commodity to be exported. Providing false or misleading EEI is a violation of ECRA. *See* 50 U.S.C. § 4819(a)(2)(F).

## III. The Defendants' Experience with and Knowledge of Export Control Laws

Given that Nayandin and Borisenko had been in the export business for a combined thirty-plus years, it is no surprise that they admitted that they have knowledge and understanding of U.S. export laws, including that the export of goods subject to item-based controls are unlawful unless

an exporter first obtains an export license. Nayandin PSR ¶¶ 23, 94; Borisenko PSR ¶ 92. Nayandin and Borisenko also had knowledge of the EAR Russia Sanctions. Nayandin PSR ¶ 23.

**First BIS Outreach.** The government's first contact with the defendants after the implementation of the EAR Russia sanctions was an outreach effort to keep the defendants apprised of the new Russia Sanctions. In March 2022—just a few weeks after the EAR Russia Sanctions—BIS Special Agents met with the defendants at their Chantilly warehouse. The BIS Special Agents provided the defendants with paper and electronic copies of documents explaining U.S. export control laws and regulations, including documents that explained criminal penalties for violating export control laws. *Id*. ¶¶ 44, 45.

During that outreach, Nayandin stated that he and Borisenko had a good knowledge of U.S. export controls and the current Russia Sanctions, a firm understanding of ECCNs and the Commerce Control List, and intimate knowledge of the export laws and regulations. *Id*. ¶ 45. Nayandin also said they knew what they could and could not send to Russia in light of the EAR Russia Sanctions and that they could not ship items with an ECCN to Russia. *Id*. As described below, however, the defendants' various transshipment schemes to Russia were already afoot.

**Second BIS Outreach.** After this first outreach, as described below, the defendants violated the EAR Russia Sanctions by falsifying export records and transshipping goods, including controlled goods, to Russia without a license. During the course of the investigation, the BIS Special Agents sought a second meeting with the defendants to discuss some of what the Special Agents had discovered, including a transshipment scheme using a freight forwarder in Finland (referred to as, "FINNISH FREIGHT FORWARDER") and a locomotive company in Turkey (referred to as, "TURKISH LOCOMOTIVE CO."). Ex. V (US01601619) (report of investigation regarding the second outreach).

On November 2, 2022, two Special Agents met with Borisenko.  *Id*. at 1.  During the interview, the agents asked about BuyUSA.ru and FINNISH FREIGHT FORWARDER. Surprisingly, during that meeting, Borisenko admitted to the key elements of the scheme to transship goods through Finland.  Specifically, Borisenko stated that Eleview's business model was such that customers bought items from BUYUSA.ru and then the items were shipped to Eleview where numerous orders were consolidated and repackaged and exported to the end destination.  *Id*. at 3.  Borisenko originally described the FINNISH FREIGHT FORWARDER as a re-seller of goods, but, when pressed with the fact that the FINNISH FREIGHT FORWARDER's website describes the company only as a freight forwarder, Borisenko stated, "It is possible that [FINNISH FREIGHT FORWARDER] send to Russia."  *Id*. at 4.

The BIS Special Agents also asked about Eleview's history with RUSSIAN TELECOM CO.  *Id*. at 5.  Borisenko explained that Eleview that, prior to the EAR Russia Sanctions, RUSSIAN TELECOM CO. was Eleview's primary customer.  *Id*.

The BIS Special Agents also explained to Borisenko that transshipping goods to Russia through third-party countries was illegal.  *Id*. at 3-4.  They explained the concept of willful blindness and the related consequences.  *Id*. at 4.  Borisenko said he understood that transshipping was illegal and (falsely) claimed that Eleview was only shipping to the third-party countries (i.e., not Russia).  *Id*. at 3-4.

During the meeting, the agents reviewed a list of goods that could not be sent to Russia without a license and provided Borisenko with copies of the relevant regulations, which contained the most up-to-date material on the EAR Russia Sanctions.  *Id*. at 2.

Notably, Borisenko continued to participate in the three transshipment schemes discussed below after BIS confronted him with the illegality of transshipment schemes and the consequences

for being "willfully blind" to the actual recipient.

## IV.    The Turkey Scheme

As part of the Turkey Scheme, the defendants fraudulently claimed that their exports to a major telecommunications company in Russia were going to a locomotive company in Turkey. Nayandin PSR ¶ 26.   The defendants shipped the telecommunications equipment from the United States to Istanbul, Turkey for transshipment to Russia.   *Id*.   To execute this scheme, the defendants and their co-conspirators coordinated "test shipments" to bypass the EAR Russia Sanctions, created a contract with the locomotive company, falsified export documentation, and, in Nayandin's case, lied directly to the BIS Special Agent who Nayandin knew was investigating Eleview.

For each of the 23 shipments in the Turkey scheme, Nayandin or Borisenko sent other U.S.-based freight forwarders facilitating the shipments a signed Shipper's Letter of Instruction ("SLI") providing false information that the shipment was bound for TURKISH LOCOMOTIVE CO. in Turkey when the shipment as actually bound for a telecommunications company in Russia ("RUSSIAN TELECOM CO."). *Id*. ¶ 33.   These false statements by Nayandin, Eleview, and Borisenko in the SLIs and other export documentation caused U.S.-based freight forwarders to file false information with the Department of Commerce.   *Id*.

RUSSIAN TELECOM CO. is a major supplier of telecommunications equipment to the Russian government, including Russia's Federal Security Service, the Russian internal security and intelligence agency (commonly known as the FSB), as well as to non-governmental consumers.   *Id*. ¶ 27.   Eleview had a longstanding relationship with RUSSIAN TELECOM CO.—it had been Eleview's client for approximately 10 or more years.   *Id*. ¶ 28.

**A. The Defendants Began Exporting "Test Shipments" as Soon as the EAR Russia Sanctions Were Implemented.**

As soon as the Russia Sanctions were enacted, the defendants began working with employees of RUSSIAN TELECOM CO. to evade the EAR Russia Sanctions by finding new transshipment routes through third countries, like Kazakhstan.

For example, on February 25, 2022—the day after the Russia Sanctions went into effect—an employee of RUSSIAN TELECOM CO. emailed Nayandin and Borisenko, stating, "We want to try a test shipment with the new itinerary, via air." *Id.* ¶ 50; Ex. A at 4 (US00931508).[2]  That same day, Borisenko asked, "What is the new itinerary?"  Nayandin PSR ¶ 50; Ex. A at 4 (US00931508).  And the employee of RUSSIAN TELECOM CO. stated, "To Kazakhstan.  To [RUSSIAN TELECOM CO.]-Kazakhstan."  Nayandin PSR ¶ 50; Ex. A at 4 (US00931508).

The defendants understood that they would be under scrutiny for continuing to work with RUSSIAN TELECOM CO.  In that same email chain about the "test shipment," BORISEKNO repeatedly requested that any reference to RUSSIAN TELECOM CO. be removed from the export paperwork.  Nayandin PSR ¶ 51.  Specifically, on March 4, 2022, Borisenko asked, "I have a big favor to ask.  Please do not use the name of [RUSSIAN TELECOM CO.] in the documents of cargos to Kazakhstan." *Id.*; Ex. A at 4 (US00931508) at 3.  And later that same day, Borisenko asked, "Can you take out the name of [RUSSIAN TELECOM CO.]?  [RUSSIAN TELECOM CO.] is already associated with Russia.  It's better not to mention it in documents."  Nayandin PSR ¶ 51; Ex. A at 3 (US00931508)  The logical conclusion from this exchange is that Borisenko was trying to remove references to RUSSIAN TELECOM CO. in an effort to reduce scrutiny of Eleview's exports.

---

[2]  The government's attachments to this motion include certified English translations of documents that were originally in Russian.

The BIS ultimately inspected this "test shipment" in April 2022.  Nayandin PSR ¶ 52; Ex. B (US00903962) (email from SA Silva).  The test shipment included four CISCO switches that required a license to go to Russia, which the defendants never obtained.  Nayandin PSR ¶ 52.

Upon learning of the BIS's inspection of the "test shipment," Nayandin took affirmative steps to obstruct the BIS's investigation into the defendants by helping create false documentation and submitting it to the Special Agent in charge of the instigation.

In April 2022, Nayandin emailed a Department of Commerce Special Agent an "End Use Certificate" for the test shipment to the Kazakhstan affiliate of RUSSIAN TELECOM CO. Nayandin PSR ¶ 31.  The certificate contained false information regarding the length of time that Eleview had been in business with the Kazakhstan affiliate, making it look like the two businesses had a relationship predating the EAR Russia Sanctions and thus that the shipment was not an effort to subvert those sanctions.  *Id.* ¶¶ 31, 53; *see also* Ex. B (US00903962) (email to SA Silva); Ex. C (US00903963) (End Use Certificate).[3]  Likewise, the document falsely noted that the ultimate consignee was the Kazakhstan affiliate and not RUSSIAN TELECOM CO.  Ex. C (US00903963) (End Use Certificate).  Nayandin admitted that he knew the amount of time the two companies worked together as written in the End Use Certificate was false when he sent it to the BIS Special Agent and that he included the false information in the certificate to reduce scrutiny of the shipment by the Department of Commerce.  Nayandin PSR ¶ 31.

Contemporaneous internal communications between the co-conspirators established that an employee of RUSSIAN TELECOM CO. asked Nayandin how long the End User Certificate

---

[3] A revised version of the End Use Certificate (with the signatures from both Nayandin and representatives from RUSSIAN TELECOM CO.-Kazakhstan) can be found at Ex. D (US01602698).  Nayandin signed the certificate next to a disclaimer, which stated, "making any false statement or concealment of any material fact … may result in imprisonment …."

should say that Eleview and the Kazakhstan affiliate had been in business. *Id.* ¶ 54; Ex. E at 3 (US00920461). The RUSSIAN TELECOM CO. employee explained that too short a period (i.e., 0 years) would "immediately attract attention." Nayandin PSR ¶ 54; Ex. E at 3 (US00920461). But saying half a year or one year "is not true." Nayandin PSR ¶ 54; Ex. E at 3 (US00920461). The employee suggested that the group could say one year and, if pressed on the issue, explain (falsely) that the two companies were in business discussion for a year without any transactions. Ex. E at 3 (US00920461).

Notably, the first contract signed between RUSSIA TELECOM CO.-Kazakhstan and Eleview appears to be dated March 10, 2022—a few days after the implementation of the Russia Sanctions and a few weeks prior to Borisenko telling the special agent that Eleview and RUSSIA TELECOM CO.-Kazakhstan had been in business for a year. Nayandin PSR ¶ 54; Ex. F (US00933528). Nevertheless, Nayandin instructed his co-conspirators to put one year on the End User Certificate, Ex. E at 2 (US00920461), and then Nayandin provided that End User Certificate to a Special Agent at BIS, Ex. D (US01602698). Nayandin PSR ¶ 54.

Ultimately, the defendants opted to send goods for RUSSIAN TELECOM CO. through TURKISH LOCOMOTIVE CO. instead of the Kazakhstani affiliate of RUSSIAN TELECOM CO. *Id.* ¶ 55.

It was obvious, however, that the defendants were still doing business with RUSSIAN TELECOM CO. The defendants admitted that throughout this period, Nayandin, Eleview, and Borisenko disregarded red flags that TURKISH LOCOMOTIVE CO. was acting as a transhipper for RUSSIAN TELECOM CO., including, among others, that emails concerning the shipments came from staff that they knew to work for RUSSIAN TELECOM CO. *Id.* ¶¶ 26, 32. By disregarding such red flags, Nayandin, Borisenko, and Eleview either knew or at a minimum were

deliberately ignorant to the fact that the subject goods were to be transshipped to Russia.   *Id.* ¶ 32.

The evidence in this case shows that Nayandin and Borisenko were aware that some of their shipments made it to Russia.   On June 30, 2022—three weeks after Eleview had exported a shipment to TURKISH LOCOMOTIVE CO.—an employee from RUSSIAN TELECOM CO. emailed Borisenko with the subject line, "PB-74270247[4] cargo question."    Ex. G (US00922678).[5]    Two employees of RUSSIAN TELECOM CO. were copied on the email.   *Id.* The employees from RUSSIAN TELECOM CO. used email addresses ending in "@[RUSSIAN TELECOM CO.].ru," indicating that the email addresses were operated by a Russian domain. Further, the employees' emails often included a signature block, which stated that their address was in Ekaterinburg, Russia.   In the email, the RUSSIAN TELECOM CO. employee wrote to Borisenko: "Please tell me, yesterday we had an inspection of this cargo, as a result of the inspection we found these fastenings, we did not see them in the parcel on the website. Were they mistakenly invested? What cargo are they from?"    *Id.*   The email included a picture of two metal fasteners lying on a table.   There was no mention of TURKISH LOCOMOTIVE CO. or any employees from said company.    That same day, Borisenko responded to the email, explaining that the fasteners were from a "mount" that was in the shipment.    *Id.*   The reasonable conclusion from this email is that employees of RUSSIAN TELECOM CO.—not TURKISH LOCOMOTIVE CO.—received and inspected the shipment in Russia, which made clear to the defendants that their shipments were going to Russia, not Turkey.

## B.  The Defendants Exported Hundreds of Items of Controlled Telecommunications Equipment to Russia Through Turkey.

Among the shipments to RUSSIAN TELECOM CO. via TURKISH LOCOMOTIVE CO.

---

[4]  "PB-74270247" is the order number.

[5]  The translations of Exhibit G are based on open-source Russian-to-English translations.

was telecommunications equipment that required a license for export to Russia, which Nayandin, Eleview, and Borisenko did not obtain.   As described above, after April 8, 2022, all items that had an ECCN (i.e., all items on the Commerce Control List) required a license to go to Russia.   The following provides two example shipments (of the 23 total shipments) that the defendants exported to RUSSIAN TELECOM CO. (through TURKISH LOCOMOTIVE CO.) that required licenses.

*ACE17975*.   According to the Department of Commerce's export database, Eleview exported a shipment referred to as ACE17975 on August 14, 2022.   The export documentation that the defendants filed with the U.S. government falsely stated that the ultimate consignee for the shipment was TURKISH LOCOMOTIVE CO. in Turkey, not RUSSIAN TELECOM CO. in Russia.   Internal communications reveal that Borisenko coordinated this shipment and provided much of the exportation paperwork.   Ex. H (US00921821) (email form Borisenko sending an invoice and SLI, among other documents, to the U.S.-based freight forwarder).   Included in that exportation paperwork was an invoice of items within ACE17975 that included the ECCN number for each line item.   Ex. I (US00921824) (invoice with ECCN for ACE17975).   On the invoice, Borisenko listed dozens of line items (amounting to over three-hundred individual items), each of which had an ECCN, meaning that each item required a license to go to Russia.[6]   The export documentation for this shipment included another invoice that Nayandin appeared to sign.   Ex. J at 5-6 (US1638046).

*S201654*.   According to the Department of Commerce's export database, Eleview exported a shipment referred to as S201654 on February 10, 2023—a year after the initial BIS

---

[6]  Assuming that the ECCNs listed by Borisenko were correct, the items with "EAR99" were not on the Commerce Control List and did not require a license to go to Russia unless they had an HTS code covered by the Russia Sanctions.   The government added the yellow highlighting on Exhibits I and M for ease of reference to indicate the items that required a license to go to Russia.

outreach and several months after the second BIS outreach.

Here too, Borisenko provided the U.S.-based freight forwarder with the export documents, including an Excel sheet with each item in the shipment and the related ECCN.  *See* Ex. K (US00845075) (email from Borisenko attaching export documents); Ex. L (US00845080) (SLI); Ex. M (US00845078) (Excel sheet with ECCN and value of items in shipment).  As with the rest of this scheme, the export documentation filed by the defendants falsely stated that the shipment was going to TURKISH LOCOMOTIVE CO. in Istanbul when, in reality, it was going to RUSSIAN TELECOM CO. in Russia.  And Exhibit M demonstrates that this shipment contained over 490 items that had ECCNs—totaling $65,000 worth of controlled goods that required a license to go to Russia.

The telecommunications equipment that Nayandin, Eleview, and Borisenko exported to TURKISH LOCOMONTIVE CO. by way of these willfully unlawful statements has an array of potential applications, including use by consumers or use by militaries to create and expand communication networks.  Nayandin PSR ¶ 24.  In all, the reported value of these 23 shipments of telecommunications equipment to Russia (through Turkey) was approximately $1,317,432.00.  *Id*. ¶ 55; *see also* ECF No. 62 ¶ 17 ("Eleview's Statement of Facts") (signed by Nayandin).

## V.    The Finland Scheme

Over approximately sixteen months, the defendants exported goods that customers in Russia purchased using Eleview's BuyUSA.ru website.  Nayandin PSR ¶ 35.  The defendants consolidated these goods and then transshipped them to Russian via FINNISH FREIGHT FORWARDER.  *Id*.

To execute this scheme, Nayandin, Eleview, and Borisenko received boxes of goods from U.S. retailers ordered by Russia-based customers through Eleview's website.  *Id*. ¶ 36.  Nayandin, Eleview, and Borisenko printed and affixed (or caused others to print and affix) to the

boxes Russian postal service shipping labels with tracking numbers and barcodes associated with the ultimate recipients in Russia.  *Id*.  They then bundled the boxes in larger pallets with an outer cardboard shell concealing the Russian postal service labels and shipped the larger pallets from Eleview's warehouse through other U.S.-based freight forwarders to FINNISH FREIGHT FORWARDER.  *Id*.  FINNISH FREIGHT FORWARDER's warehouse in Finland was co-located with an office of the Russian postal service, which received the individual boxes pre-labeled with Russian postal service barcodes and delivered them to the ultimate recipients in Russia.  *Id*.

The defendants falsely claimed on export documents that the FINNISH FREIGHT FORWARDER was the ultimate consignee for the goods and Finland was the final destination. *Id*. ¶ 39.  The defendants' false statements caused the U.S.-based freight forwarders to file false information on behalf of Eleview with the Department of Commerce, including false EEI.  *Id*.

### A.  The Defendants Executed the Finland Scheme Through Lies and Deceit.

By way of example, the following exchanges show how the defendants lied to U.S.-based companies about the exports and then coordinated with co-conspirators in Finland and Russia to complete the transshipment scheme.

On March 11, 2022, Borisenko told a freight forwarder in Maryland, copying Nayandin, that "[t]his shipment is for Finland ONLY, and will not be transported to Russia," which at the time, Nayandin, Eleview, and Borisenko knew was false.  *Id*. ¶ 37; Ex. N (US00928687).  Later that same day, Borisenko emailed the Maryland freight forwarder, copying Nayandin, an SLI signed by Nayandin concerning that shipment from Eleview to Finland.  Nayandin PSR ¶ 37; Ex. O (US00928691) (SLI).  The SLI listed FINNISH FREIGHT FORWARDER as the ultimate consignee, which Nayandin, Eleview, and Borisenko knew was false.  Nayandin PSR ¶ 37; Ex. O (US00928691).  Nayandin signed the SLI under a certification that "all information contained

herein are true and correct" and an acknowledgement that Nayandin understood the civil and criminal penalties for providing false information.   Ex. O (US00928691).

Later the same day, Borisenko emailed a spreadsheet with details about the shipment to employees of FINNISH FREIGHT FOWARDER and the Russian postal service, copying Nayandin.   Nayandin PSR ¶ 37; Ex. P (US00926652). The spreadsheet listed the real recipients of the goods in the shipment, including dozens of individuals with addresses in Russia.   Nayandin PSR ¶ 37; Ex. Q (US00926654).   Several days later, Nayandin emailed the same group, explaining that the shipment had arrived at FINNISH FREIGHT FORWARDER and that the Russian postal service "barcodes are on every box" in the shipment.   Nayandin PSR ¶ 37; Ex. R (US00926651).

Essentially, the defendants exported large pallets that, on the outside, had no indication that the contents were bound for Russia, but, on the inside, contained individual boxes with barcodes that the Russia Post could scan and affix with its own labels to for customers in Russia.

**B.  The Defendants Exported Controlled Goods to Russia Through the Finland Scheme.**

The items that Nayandin, Eleview, and Borisenko exported to Russia by way of the FINNISH FREIGHT FORWARDER included goods that required a license to export to Russia, which Nayandin, Eleview, and Borisenko did not obtain.   Nayandin PSR ¶ 38.

For example, in or around July and August 2022, Nayandin, Eleview, and Borisenko exported to Russia an ethernet transceiver with an Export Control Classification Number 5A991.b, which required a license to export to Russia, which Nayandin, Eleview, and Borisenko did not obtain.   *Id*.; Ex. S (US01637714) (Excel file showing Eleview's database information associated with the ethernet transceiver).   The ethernet transceiver is controlled by BIS due to anti-terrorism concerns.   Nayandin PSR ¶ 38; Ex. T (US01658696) (license determination).

This exact type of ethernet transceiver has been found on the battlefield in Ukraine as part

15

of a Russian "suicide drone" called the "Lancet-3."    Nayandin PSR ¶ 56; Ex. U (Report from Conflicts Armaments Research).    Russia's Lancet-3 is strapped with explosives and loiters around an area until the pilot identifies a target.    Nayandin PSR ¶ 56.    The pilot then flies the Lancet-3 into the target, detonating the explosives.    *Id*.    Open-source reporting explains that Lancet-3 has been used by Russian forces to destroy some of Ukraine's most valuable military equipment, including tanks and jets.    *Id*.

In all, Nayandin, Eleview, and Borisenko exported 82 shipments from the United States to Russia in the Finland Scheme, with a reported value of over $3.4 million.    *Id*.; *see also* Eleview's Statement of Facts ¶ 23.

## VI.    The Kazakhstan Scheme

Like the Finland Scheme, the Kazakhstan Scheme involved the defendants making false statements to U.S.-based freight forwarders about the country of ultimate destination and ultimate consignee of their exports.    Between March 2022 through June 2023, the defendants exported consumer goods, electronics, and telecommunications equipment to a Kazakhstan-based shipping company (referred to herein as "KAZAKH SHIPPING SERVICE") for transshipment to Russia. Nayandin PSR ¶ 40.    Nayandin, Eleview, and Borisenko conspired to and did falsely state on export documentation that KAZAKH SHIPPING SERVICE was the end user or ultimate consignee for these shipments, but they knew and understood that some of the goods would be transshipped from Kazakhstan to the real end users in Russia.    *Id*.    Here too, the defendants' false statements in export documents, which the defendants provided to U.S.-based freight forwarders, caused the U.S.-based freight forwarders to file false information with the Department of Commerce.    *Id*. ¶ 43.

As with the other schemes, the Kazakhstan Scheme also involved the exportation of controlled goods without a license.    *Id*. ¶ 42.    For example, in or around June 2022, Nayandin,

Eleview, and Borisenko exported two oscilloscopes, which can be used to, among other things, debug, and maintain electronic equipment, and which were subject to the EAR and classified under ECCN 3A992.a.  *Id.*  Borisenko sent a U.S.-based freight forwarder an SLI signed by Nayandin listing Kazakhstan as the country of ultimate destination and KAZAKH SHIPPING SERVICE as the ultimate consignee, despite the defendants knowing that the oscilloscope was destined for an end user in Moscow, Russia.  *Id.*  The oscilloscope required a Department of Commerce license prior to export to Russia, which Nayandin, Eleview, and Borisenko never obtained.  *Id.*

In all, Nayandin, Eleview, and Borisenko exported at least 52 shipments from the United States to Russia as part of the Kazakhstan Scheme, with a reported value of approximately $1,468,816.00.  *Id.* ¶ 57; *see also* Eleview's Statement of Facts ¶ 28.

\* \* \* \* \*

In total, through the three schemes, the defendants illegally exported over $6.1 million worth of goods through 157 shipments and lied in export documentation about the destination of each of those 157 shipments.   Nayandin PSR ¶¶ 55-57; Eleview's Statement of Facts ¶¶ 17, 23, 28.

## ANALYSIS

### I.    Legal Standard

The standards governing sentencing are well established. This Court must consult the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") as well as the factors set forth in 18 U.S.C. § 3553(a) when making a sentencing decision, though the Sentencing Guidelines are purely advisory. *See United States v. Booker*, 543 U.S. 220 (2005). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set

forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Under 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendants; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61.

## II. Sentencing Guidelines

### A.    Eleview International Inc.

The Court accepted the parties' plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), which included the following terms: (1) a criminal fine of $125,000; and (2) a three-year term of probation, with corporate disclosure and ongoing training requirements.

### B.    Oleg Nayandin

***Plea Agreement***.    The parties agreed to recommend the following provisions of the sentencing guidelines:

| Guideline(s) | Description | Offense Level |
|---|---|---|
| § 2M5.1 | Base Offense Level (national security controls were evaded) | 26 |
| § 3E1.1(a), (b) | Acceptance of Responsibility[7] | -3 |

---

[7]    Nayandin qualifies for a two-level decrease in his offense level under § 3E1.1(a) because he timely notified the government of his intention to plead guilty. ECF No. 64 at 3-4. Because his offense level before operation of that section is 16 or greater, the government moves for the additional one-level decrease under U.S.S.G. § 3E1.1(b), for a total decrease of three points for acceptance of responsibility. *Id*.

ECF No. 64 at 3-4.    The parties did not agree on any other sentencing issues.    *Id*. at 4.

***Presentence Investigation Report***.    The PSR correctly calculated Nayandin's total offense level as 27.

The government agrees with the PSR that Sentencing Guidelines § 2M5.1 applies to a conviction of 50 U.S.C. § 4819(a)(1). PSR ¶ 64.    As described in the Statement of Facts, Nayandin evaded the Commerce Department's comprehensive export controls imposed in response to the Russian Federation's invasion of Ukraine in 2022, which were enacted "*to protect U.S. national security* and foreign policy interests by further restricting Russia's access to items that it needs to support its military capabilities." 87 Fed. Reg. at 57,068 (emphasis added). Because these national security controls were evaded, the base offense level is 26. *See* U.S.S.G. § 2M55.1(a)(1)(A).

The government further agrees with the PSR that Nayandin should receive a role enhancement of +4 points under § 3B1.1.    PSR ¶¶ 59, 67; *see also* PSR at 27.    Under § 3B1.1(a), an enhancement is appropriate where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."    USSG § 3B1.1(a).

The facts of this case support the conclusion that Nayandin was an organizer or leader of criminal activity.    Nayandin was the sole owner, CEO, and President of Eleview, which pleaded guilty to this conspiracy.    PSR ¶ 59.    Even Borisenko—who led the day-to-day operations of the warehouse—was not an officer of Eleview.    As a chief executive of Eleview, Nayandin was responsible for supervising Borisenko and any other employees at Eleview.    Moreover, the defendants' co-conspirators in this case—including employees of RUSSIAN TELECOM CO.— looked to Nayandin for guidance on things like how to conduct the test shipment and how to provide a false End User Certificate to BIS.    *See e.g.*, Ex. E at 3 (US00920461).    Similarly, it was

Nayandin who gave instructions to the defendants' co-conspirators in the Finland Scheme about when the first shipment would arrive, how they were packaged, and what the individuals at the FINNISH FREIGHT FORWARDER and the Russian postal service needed to do with the packages (i.e., apply labels).   Ex. R (US00926651).

Moreover, there are more than five co-conspirators involved in this scheme.   In addition to Nayandin, Borisenko and Eleview were, of course, involved.   As were the employees at RUSSIAN TELECOM CO., FINNISH FREIGHT FORWARDER, and the Russian postal service, all of whom began making efforts to avoid scrutiny of their transshipments by working with the defendants to lie about the ultimate consignees or obfuscate the route of the exports.

Nayandin does not qualify for a reduction under § 4C1.1 (zero-point offender) because he should receive an adjustment under § 3B1.1 (aggravating role).   U.S.S.G. § 4C1.1(a)(10).

In sum, Nayandin's total Guidelines offense level is 27 and his criminal history category is I, resulting in a Guidelines range of 70 to 87 months' imprisonment, PSR ¶¶ 73, 76, 99.

### C.   Vitaliy Borisenko

*Plea Agreement*.   As with Nayandin, the parties agreed that the following provisions apply to Borisenko:

| Guideline(s) | Description | Offense Level |
|---|---|---|
| § 2M5.1 | Base Offense Level (national security controls were evaded) | 26 |
| § 3E1.1(a), (b) | Acceptance of Responsibility[8] | -3 |

---

[8]   Borisenko qualifies for a two-level decrease in his offense level under § 3E1.1(a) because he timely notified the government of his intention to plead guilty. ECF No. 67 at 3-4. Because his offense level before operation of that section is a level 16 or greater, the government moves for the additional one-level decrease under U.S.S.G. § 3E1.1(b), for a total decrease of three points for acceptance of responsibility. *Id*.

ECF No. 67 at 3.   The parties also agreed that the government would not seek an aggravating role enhancement under U.S.S.G. § 3B1.1 at sentencing.   *Id*. at 3.   The parties did not agree to any further sentencing issues related to the Sentencing Guidelines or the factors listed in 18 U.S.C. § 3553(a).   *Id*. at 4.

***Presentence Investigation Report***.   For the reasons described above, U.S.S.G. § 2M5.1(a)(1) provides the appropriate base offense level.   Borisenko PSR ¶¶ 64.   The government also agrees with the conclusion Borisenko is an "average participant" in the conspiracy and is not deserving of a mitigating adjustment for his role in the offense.   *Id*. ¶ 60. Borisenko qualifies for a reduction under § 4C1.1 (zero-point offender).   *Id*. ¶

In sum, Borisenko's total Guidelines offense level is 21 and his criminal history category is I, resulting in a Guidelines range of 37 to 46 months' imprisonment.   *Id*. ¶¶ 73, 76, 99.

### III. Statutory Analysis and Recommendation

Based on the § 3553(a) factors, the United States recommends a sentence of imprisonment of 70 months for Nayandin and 37 months for Borisenko, a term of supervised release of three years, and the imposition of the special conditions of supervised release listed in the PSR.

### A.    Nature and Circumstances of the Offense

There are four considerations about the nature and circumstances of this offense that weigh in favor of a guideline sentence here.

*First*, the government expended efforts to ensure the defendants were on notice regarding the EAR Russia Sanctions and had the necessary resources to abide by the law.   In March 2022, mere weeks after the implementation of the sanctions, BIS Special Agents conducted an outreach with the defendants.   The defendants reassured the Special Agents that they were familiar with the export control laws and aware of the new sanctions.   One might have left that meeting feeling confident that the defendants were working hard to change their business model to allow for lawful

exports to Russia or to other countries.    Unfortunately, the defendants continued their scheme to transship their goods and avoid scrutiny.

Moreover, in Borisenko's case, Special Agents held a second meeting in November 2022. In that meeting, they addressed their concerns that Eleview was transshipping goods through the FINNISH FREIGHT FORWARDER.    They pushed back on Borisenko's purported explanation that this freight forwarder—which did not purchase or resell goods—was the "ultimate consignee." And Borisenko ultimately admitted that many of the goods may end up in Russia.    Nevertheless, the defendants proceeded full steam ahead with their transshipment scheme.

*Second*, the defendants' conspiracy was based on dozens of lies to U.S. companies, the Department of Commerce, and federal investigators.    To effectuate their scheme, the defendants lied to U.S.-based freight forwarders each and every time they submitted export paperwork that included false ultimate consignees and countries of ultimate destination.    In one stark example, Borisenko told a U.S.-based freight forwarder in no uncertain terms, "[t]his shipment is for Finland ONLY, and will not be transported to Russia."    Ex. N (US00928687).    But within hours, Borisenko emailed his co-conspirators at the FINNISH FREIGHT FOWARDER and the Russian postal service, copying Nayandin, and provided them with a spreadsheet with all of the Russian addresses for the real ultimate consignees.    Ex. P (US00926652); Ex. Q (US00926654). Nayandin was no bystander.    He provided instructions to these same co-conspirators about how the goods were packaged to include barcodes that were linked to the true ultimate consignees. Ex. R (US00926651).    Thus, there is no doubt that Nayandin and Borisenko were actively deceiving U.S. companies to effectuate their scheme.

The defendants also lied to the U.S. government and to federal investigators.    For each of the 157 shipments described in the statement of facts, the defendants caused others to file

paperwork on the defendants' behalf that provided false information.    Each of those false statements is a distinct violation of ECRA.

Nayandin took it a step further.    When a BIS Special Agent told Nayandin that one of his exports—notably, one of the "test shipments"—was being inspected, Nayandin provided the BIS Special Agent with a sworn End User Certificate providing false information about the ultimate consignee.    The internal communications about the End User Certificate included a co-conspirators statement acknowledging that saying the two companies were in business for any period of time would be false.    Ex. E at 2 (US00920461).    Nevertheless, Nayandin opted to lie, knowing that he was signing the document under penalty of perjury and that the BIS was investigating this shipment.    This brazen disregard for the law and attempt to thwart the investigation warrant a considerable term of imprisonment.

*Third*, the types of goods that the defendants exported through their scheme undermine the national security of the United States.[9]    The exports were "dual-use" items—a reference to both the civilian and military applications. The government has imposed license requirements to export many of these dual-use items to Russia because it is difficult for Russia to manufacture these items itself, and these items are essential to Russia's ongoing invasion of Ukraine.    In other words, without people like the defendants, Russia's ability to obtain these dual-use items to propel its invasion would be greatly diminished.

---

[9]  Under the 2024 version of § 2M5.1, the application notes provided that an upward departure may be warranted in "the case of a violation during the time of war or armed conflict," such as the war in Ukraine.    Cmt. 3(B), U.S.S.G. § 2M5.1 (2024).    In the 2025 version of the guidelines, these departure considerations are still relevant to the Court's assessment but should be viewed under the § 3553(a) factors instead of as a departure.    The government submits that the fact that the defendants' conduct took place at a time of war—indeed, in response to a war—weighs in favor of a sentence within the guideline.

The danger of dual-use items—and the reason why export controls are essential to national security—is that once these dual-use items leave the United States, the government has little to no insight into or control over who receives them and how they are used.    Therefore, the government expends considerable resources reviewing export information to try to stop the illegal and unlicensed export of dual-use items.    Because of the volume of exports from the United States, the government relies heavily on the detailed and *truthful* information provided by exporters.    But when exporters—like the defendants—purposefully circumvent the export control requirements by providing false information to send dual-use items to prohibited destinations like Russia, it undermines the government's ability to protect U.S. national security interests.    These concerns are heightened where the true consignee has connections with the Russian government, as is the case with RUSSIAN TELECOM CO.'s connection with the FSB.

The government highlights here some examples of the defendants' exports that are particularly concerning.    As it relates to the telecommunications equipment, the defendants exported hundreds of controlled items to RUSSIAN TELECOM CO.    As shown in Exhibits I and M, in any given shipment, there may have been dozens or hundreds of controlled goods.    And the Russian government can use these goods to create and expand its telecommunications infrastructure—a necessity as it attempts to expand its geographic territory.

Further, the ethernet transceiver that the defendants exported through the Finland scheme is used in a Russian-made drone called the Lancet-3.    Researchers from Conflicts Armament Research inspected captured Russian weaponry from its invasions of Ukraine and found that this ethernet transceiver was a component in the Lancet-3 on multiple occasions.    The Lancet-3 functions as a loitering munition, meaning it can loiter in an area until the operator identifies a target—such as soldiers, a tank, or artillery—to attack.

24

To be sure, the defendants will likely contend that they did not know that RUSSIAN TELECOM CO. worked closely with the Russian government or that the government does not know whether any goods actually contributed to the Russian war effort.    But that is beside the point.    The defendants violated ECRA multiple times by transshipping goods to Russia and by lying about it, which drastically limits the ability for the U.S. government to know or control what U.S. goods are making it to the Russian government.    The violation of ECRA occurs in the export of the good, not in the ultimate use of that good.    But the danger posed by the defendants' conduct can and should be considered by the Court as part of the nature and circumstances of the offense.

*Finally*, the scope of these schemes weighs in favor of a guidelines sentence.    The sheer volume of goods—157 shipments across three distinct schemes totaling over $6.1 million—establishes that this was not a one-off mistake by the defendants.    Had the defendants ceased their illegal exports after the first BIS outreach in March 2022, their conduct may have been better resolved through civil or administrative remedies.    Had the defendants stopped their scheme after the second BIS outreach in November 2022, the guidelines range might have overstated their culpability.    But the defendants continued to export millions of dollars' worth of goods in violation of ECRA for *months* after the second BIS outreach.[10]

---

[10] Notably, the 2024 version of the base-offense level provision, § 2M5.1, instructed that, in determining the appropriate sentence *within* the guideline range, the court should consider "the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences."    Cmt. n.3(A), U.S.S.G. § 2M5.1 (2024).    But, "[w]here such factors are present in an extreme form, a departure from the guideline may be warranted."    *Id*.    With the 2025 guidelines, as with the other departure provisions, the Court should consider these factors under § 3553(a).    U.S.S.G. Ch. 1, Pt. A, intro. comment.    Here, the defendants exported over $6.1 million dollars' worth of goods through various foreign front companies and freight forwarders, exported *hundreds* of controlled goods, and did so over the course of 157 shipments.    These facts weigh in favor of a sentence within the guideline range.

Given the serious nature and circumstances of the offense, a sentence at the low end of—but not below—the guidelines range is appropriate.

### B.    Defendants' History and Characteristics

*Oleg Nayandin.*    Nayandin's history tells the story of a hardworking, highly educated, and resourceful first-generation American.    After obtaining his master's degree in Tomsk, Russia, Nayandin obtained his doctorate at Western Michigan University before ultimately moving to Virginia, where he has lived for the last 25 years.    Nayandin PSR ¶ 83.    Nayandin has taken full advantage of his life in the United States.    In those 25 years, he became a citizen, raised a son with his wife of over thirty years, and began a business.    *Id.* ¶ 84-85.    His friends, colleagues, and teammates discuss his high intellect and commitment to his community.    He has no criminal record.

Nayandin's lack of criminal history indicates that his conduct in this case may be an aberration from his normal conduct.    And the government hopes that it was.    But this is not the case of an isolated, reactionary mistake in a shifting legal landscape.    The crime to which Nayandin pleaded guilty involved calculated, repeated violations of the law, a disregard for the government's attempt to assist him, and intentionally false statements designed to thwart the government's investigation, all over the course of nearly eighteen months.    Nayandin undermined the national security of the United States—the country that provided him the opportunity to flourish—by willfully violating export control laws despite having multiple opportunities to make the right choice.

*Vitaliy Borisenko*.    Like Nayandin, Borisenko appears to come from a stable home.    He has lived in the United States for many years and been a citizen for the last ten.    Borisenko PSR ¶ 83.    He received his bachelor's degree in 2009 and immediately began working at Eleview for

Nayandin.  *Id.* ¶¶ 90-91.   Here too, Borisenko's current charges appear to be an outlier from his normal conduct.

Both Nayandin and Borisenko had the educational background, family support, and business experience to pursue law-abiding lifestyles.   Unfortunately, after the promulgation of the EAR Russia Sanctions, they deliberately opted to create multiple, illegal transshipment schemes instead.   Their history and characteristics weigh in favor of a guideline sentence here.

### C.   The Need for Adequate Deterrence and Protecting the Public

This case calls for both specific and general deterrence.   As to specific deterrence, the record establishes that both defendants brazenly and repeatedly violated the law.   They continued to violate the law even when they knew the government was scrutinizing their exports.   They planned and executed their schemes after the government's outreach efforts and after the government seized one of the "test shipments" for inspection.   Nayandin lied directly to investigators to obstruct the investigation.   Borisenko lied repeatedly to the U.S.-based freight forwarders, in part by using fraudulent documents that Nayandin had sworn were true and accurate. Though this is the defendants' first conviction, the scope, frequency, and flagrancy of their conduct demonstrate a disregard for the law and a need for serious consequences to ensure that this is their last conviction.

In addition to specific deterrence, there is also a need for general deterrence.   As quickly as these prosecutions are brought, new procurement networks are set up to replace them and continue to fuel the Russian war effort.   These procurement networks require an entire ecosystem of individuals and businesses to succeed—from the individuals who agree to acquire the goods, to the companies that sell the goods, to the freight forwarders who export the goods, to the banks that process the transactions.   A significant sentence will send a powerful message to each of these links in the chain and warn them that participating in the illegal export of goods to Russia will

result in imprisonment and other consequences.    Indeed, even those entities and individuals who might not have been aware that their conduct violated the law are more likely to engage in rigorous review of transactions and other compliance activity if they know that failing to do so can lead to serious criminal consequences.

### D.    Avoid Unwarranted Sentencing Disparities

The government's recommended sentence appropriately reflects the defendants' culpability in light of comparable export control cases.    Under 18 U.S.C. § 3553(a)(6), the Court should consider cases *nationally*, not just cases within the Eastern District of Virginia.    *United States v. Fry*, 792 F.3d 884, 892 (8th Cir. 2015) (collecting cases).    Generally, by starting with the guideline range, a district court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities."    *United States v. Sueiro*, 59 F.4th 132, 141–42 (4th Cir. 2023) (citing *Gall*, 552 U.S. at 54).    And "[t]he requirement of procedural reasonableness does not obligate a trial court to engage in case-by-case comparisons of sentences imposed in cases unconnected to the case before the court."    *Id*. at 142.    The government highlights the following cases as points of reference for the Court:

- A defendant who pleaded guilty to an ECRA conspiracy to export controlled parts for commercial airplanes to Russia without a license—a base offense level of 26 under U.S.S.G. § 2M5.1—was sentenced to 70 months' imprisonment. Judgment, ECF No. 105, *United States v. Patsulya*, No. 2:23-cr-770 (D. Ariz. Apr. 2, 2025).

- A defendant who pleaded guilty to an ECRA conspiracy to export controlled electronic components to Russia without a license—a base offense level of 26 under U.S.S.G. § 2M5.1—was sentenced to 40 months' imprisonment. Judgment, ECF No. 93, *United States v. Goltsev*, No. 1:23-cr-452 (E.D.N.Y. Feb. 5, 2025).

- A defendant who pleaded guilty to an Arms Export Control Act conspiracy to export controlled rifle parts to Russia without a license—a base offense level of 26 under U.S.S.G. § 2M5.1—was sentenced to 46 months' imprisonment. Judgment and Memorandum & Order, ECF Nos. 51, 53, *United States v. Kuznetsov*, No. 1:21-cr-99 (E.D.N.Y. Apr. 30, 2024).

- A defendant who pleaded guilty to an ECRA conspiracy to export two-way radios to Russia without a license—a base offense level of 26 under U.S.S.G. § 2M5.1—was sentenced to 31

months' imprisonment. Minute Entry, *United States v. Horvath*, No. 1:24-cr-401 (D.D.C. Sept. 30, 2025).

- A defendant who pleaded guilty to an ECRA conspiracy to export scientific equipment—with a base offense level of 26—was sentenced to one year and one day in prison. Judgement, ECF No. 44, *United States v. Chao*, No. 1:25-cr-169 (E.D. Va. Dec. 18, 2025).

The defendants' conduct shows a callous disregard for the consequences of their action. The defendants prioritized profits over principle. Without concern that the $1.3 million worth of telecommunications equipment could support Russia's war effort. Without care that some of the electronic components could be used for drone warfare. Their disregard for the law and the consequences of their action warrant a serious sentence. And a sentence within the guidelines range here would avoid unwarranted disparities with the sentences in these other cases.

## CONCLUSION

A term of incarceration at the low end of—but not below—the sentencing guidelines range will adequately capture the full extent of the § 3553(a) factors and appropriately reflect the seriousness of the offense and the risk of harm the defendants created for this country and its allies.

Respectfully submitted,

Todd Blanche
Deputy Attorney General

Date:   February 6, 2026          By:   */s/ Gavin R. Tisdale*
                                         Gavin R. Tisdale
                                         Sehar F. Sabir
                                         Assistant United States Attorneys
                                         United States Attorney's Office
                                         Eastern District of Virginia

                                         John A. Eisenberg
                                         Assistant Attorney General
                                         National Security Division

                                         Garrett Coyle
                                         Trial Attorney