IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 1:25-CR-46-LMB |
| OLEG NAYANDIN, | |
| Defendant. | |

## DEFENDANT'S POSITION ON SENTENCING

### Introduction

Oleg Nayandin, a modest man from eastern Kazakhstan, came to the United States as a twenty-something young man to get an education. Thirty years later, he is a U.S. citizen, he has a beautiful family, he has a home in northern Virginia, he built a (once) successful business, and he is well-respected in his community. Mr. Nayandin has worked extremely hard in his business, cared for his family, and developed deep relationships with those around him. As a businessman, Mr. Nayandin had navigated the regulations for exporting to Russian for almost 20 years without violations or problems of any kind, which is really what this case is about. Eleview International, Inc. (Eleview) was simply trying to conduct its business the way it always had. Once the industry changed, Mr. Nayandin made some poor decisions.

To say the freight forwarding industry changed at a rapid rate after the Russian sanctions went into effect is an understatement. The 2022 and 2023 business years were a whirlwind of activity. Change was exponential and like many companies, Eleview tried its best to keep pace. The Department of Commerce (DOC) changed the export controls

often, at least four times in the first half of 2022. Regardless, Mr. Nayandin should have ensured that DOC procedures were followed. For consumer goods headed to Russia, Eleview listed final destinations such as Finland or Kazakhstan, and Mr. Nayandin readily admits this was wrong. But there were reasons for this practice unrelated to shipping "controlled items," a market Eleview chose not to pursue, or attempts to violate the Export Control Reform Act (ECRA). Eleview chose not to export controlled items in an effort to simplify its exporting process, but there were still obstacles in the industry.

That is extremely important for the Court to understand—Eleview's violation of export controls were not motivated by an intent to evade DOC's licensing scheme. Accurately determining which items needed a license was Eleview's biggest problem and they got that wrong on several occasions. The only reason that Eleview ever shipped a product that needed a license was due to miscalculation. That is why there are so few examples of Eleview shipping a product without a license. It was only after Eleview determined (in error) that a particular item did not require a license that a shipment was scheduled.

Mr. Nayandin, and Eleview, did list incorrect ultimate consignees (UCs) and incorrect countries of ultimate destination (CUDs) on the shipper's letter of instruction (SLI) in some of the company's shipments during the relevant time period. Mr. Nayandin accepts complete responsibility for that practice. By no means an excuse, there were logistical reasons for this that will be explained below. More importantly, Mr. Nayandin has reflected deeply on his conduct and he sincerely understands why his actions were wrong. He understands that listing incorrect information on an SLI

prevents the Government from conducting its regulatory scheme. As the Government stated, it left them "powerless" to enforce their export controls. If the United States does not know which products are heading to Russia, it cannot inspect and enforce its regulations. Mr. Nayandin had no thoughts of harming this country. He became a naturalized U.S. citizen because he loves this country, he values deeply the opportunities he received here, and he would never want to action to the detriment of the United States.

The biggest reason that Mr. Nayandin decided to plead guilty to a felony and accept responsibility for his actions is that he understands the wrongfulness of his conduct and the potential harm to the United States. But he would still like the Court to have some context. Mr. Nayandin's intent was to comply with export administrative regulations (EAR) by not dealing with licensed products, but also to stay in business by continuing to ship products to customers in Russia. The incorrect procedures lasted just over a year and then Eleview corrected them. It is sadly ironic that Mr. Nayandin nonetheless violated ECRA and his business is now failing.

Mr. Nayandin is sincerely remorseful for his poor decisions. His family, his company, and his employees have all been harmed by his actions. But Mr. Nayandin's case is one for mercy. Perhaps, more accurately, his case is one for fair and reasonable justice. As the Court will see, Mr. Nayandin's positive contributions to his family, his community, and others vastly outweigh his wrongs in this case. There are a variety of reasons, discussed below, to sentence him to probation, allowing Mr. Nayandin to continue the outstanding rehabilitation he and Eleview have demonstrated during the

pendency of this case, or alternatively, to sentence Mr. Nayandin to home confinement for 6 months so that he can attempt to save his business, which has been compliant and had no export violations since June 2023.

**BACKGROUND**

On November 1, 2024, the Government filed a criminal complaint charging Eleview, Mr. Nayandin, and Mr. Borisenko (Eleview *et al.*) with violating ECRA. Mr. Nayandin turned himself in on the following Monday, November 4th. He was released on a personal recognizance bond with pretrial supervision. He has been in good standing with pretrial services since the day he was released. Eleview was largely de-banked after the Government published its press release in this case and they lost many of their customers. However, Eleview has attempted to remain in business and whether that will work is very unclear at this time.

The Government indicted Eleview *et al.* on February 27, 2025 with 17 counts alleging violations of ECRA. ECF #27. Based on the Attorney General's newly issued guidance earlier that month,[1] Eleview *et al.* advocated to DOC and the DOJ that this matter should be civil in nature. Eleview did not deal with military weapons or products; they strictly ship consumer goods. Moreover, there were only a handful of shipments that contained violations. After the parties had several rounds of discussions, however, the Government declined this request.

---

[1] *Memorandum for All Employees*, Office of the Attorney General, p.4, Feb. 5, 2025 (stating that "the Counterintelligence and Export Control Section, including the FARA Unit, shall focus on civil enforcement, regulatory initiatives, and public guidance.") last accessed 2/6/2026 at https://www.justice.gov/ag/media/1388541/dl?inline.

Subsequently, Eleview *et al.* agreed to plead guilty to one count of conspiracy to violate 50 U.S.C. § 4819(a)(2)(F) regarding the SLI certificates. They are scheduled to appear before the Court on February 13, 2026 for sentencing.

**CORRECTIONS / OBJECTIONS TO THE PRESENTENCE REPORT**

Paragraph 75 should be corrected to note that Mr. Nayandin's reckless boating charge in Spotsylvania County has been dismissed.

**Factual Objection**

Mr. Nayandin objects to the value of total shipments offered by the Government, without corroboration, in the presentence report (PSR) ¶¶ 55-57. These figures have not been proved beyond a preponderance of the evidence. From the very beginning of this investigation, there have been significant disagreements with the Government about the values of shipments and goods contained within them. In every specific instance, the agents' estimates have not just been incorrect, but wildly incorrect. A couple examples are warranted.

The first example is Eleview's shipment from August 16, 2022 to the Russian Telecom Company (RTC), a company not on the entity list or any other U.S. denied party lists. Eleview attempted to ship telecommunications equipment, including Cisco network switches,[2] directly to Russia, mistakenly believing a license was not required after they submitted an inquiry via DOC's online SNAP-R website:

[2] A Cisco network switch is a device used to connect multiple devices, like printers, tv screens, or laptops that have these switches, within a local area network (LAN).



1a. EXPORTER (Name and address including ZIP CODE)
ELEVIEW INTERNATIONAL INC
4262 ENTRE CT, STE K
CHANTILLY VA 20151
OLEG NAYANDIN

SHIPPER'S LETTER OF INSTRUCTIONS

b. EXPORTER'S EIN (IRS) NO.
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

c. PARTIES TO TRANSACTION
☐ Related ☒ Unrelated

2. DATE OF EXPORT 08-16-22

3. BILL OF LADING/AIR WAYBILL NO.

4a. ULTIMATE CONSIGNEE
OOO NAG
Krasnolesya Str 12a
Ekaterinburg,RUSSIA
Pavel Shpilko +7-343-3799838 NAG620110

SHIPPER'S REFERENCE
PB-93467612

b. INTERMEDIATE CONSIGNEE

5. FORWARDING AGENT
ALLIANCE CARGO EXPRESS
147-24 176th Street, Jamaica, NY, 11434, USA
jfk.ops@allexpcargo.com / 347 343 42 11

6. POINT (STATE) OF ORIGIN OR FTZ NO.
Virginia USA

7. COUNTRY OF ULTIMATE DESTINATION
RUSSIA



SNAP- R

SNAP-R Home
Create Work Item
List Work Items
Search Work Items
Search Documents
View Messages
Manage User Profile
User Security Questions
HelpOpens a new window
Logout
STELAOpens a new window
SNAP-R Self Management

Commodity Classification Request
Work Item Reference Number 1000235 Status: RESPONDED

Request

Request Details

| | |
|---|---|
| Subject | Request to Applicant |
| Requested by | BIS |
| Date of Request | 06/20/2022 |
| Responded By | Oleg Nayandin |
| Date Responded | 06/20/2022 |
| Status | RESPONDED |
| Reference Number | 1000235 |
| Request: | Hello Oleg,<br>Please contact CISCO for the ECCN determination for the listed item. You may also visit CISCO's Website and search their export control page for items that have been reviewed or self-classified by CISCO. I a returning this application without action. |
| Response: | Thank you. It is cisco self classification. We would like to have your classification . it is mass produced consumer sold network switch washout any encryption. I provided specs. We can get cisco pre classification as they said, of cause. |
| Documents Allowed: | ☑ |

Documents Attached

No document attached

Work Item 1000235 Work Item 1000235 Request List

As an aside, if the Government's theory is correct, Eleview would not have overtly sent an SLI indicating a CUD of Russia with products requiring licenses. However, some, but not all, of the shipment (21 Cisco network switches) required licenses for export to Russia. Therefore, the shipment was seized. U.S. Customs and Border Protection (CBP) initially valued the seized network switches at $70,274.00. That was extremely inaccurate. Eleview purchased those network switches for $3,765.00 and sold them to RTC for $5,985.11 in total. CBP's appraised value was almost twelve times higher than the actual value.

As another example, law enforcement seized a wide variety of items from Eleview's warehouse, claiming at the time that the goods seized were worth more than

$3,000,000.00. As the case moved closer to trial, the Government's original estimate fell to $2,300,000.00, with a then-current value of $1,700,000.00, reflecting the decreasing value of electronics over time. However, defense counsel for Eleview was able to demonstrate that every item on the inventory list was, in fact, available *for less than a total of* $15,000.00, which included shipping costs to the customer. Mr. Nayandin provided the Government with a spreadsheet containing live eBay links with "Buy it Now" prices for each item seized by agents, as evidence of this value. The Government thereafter agreed to reduce Eleview's fine in this matter to $125,000.

Mr. Nayandin does not deny responsibility for his actions in any way, but the Government's inability to accurately assess monetary value in this matter has been troubling. In fact, some of their estimates have been over 100 times higher than the actual value. Therefore, Mr. Nayandin must object to the Government's proffered value of shipments in these paragraphs.

**<u>Objection to the Guidelines Calculation</u>**

Before a Court can apply any given sentencing enhancement under the Guidelines, the Court must find, under a preponderance standard, that the evidence supports such an enhancement. *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009) ("[p]reponderance of the evidence is the appropriate standard of proof for sentencing purposes"); *United States v. Noe*, 191 Fed. Appx. 216, 218 (4th Cir. 2006) (district court's use of preponderance of evidence standard in making factual findings supporting sentencing enhancements was constitutional). Further, in determining whether a given Guideline provision applies to a specific case, a sentencing court must

first examine the guideline's plain text. *See United States v. Campbell*, 22 F.4th 438, 444 (4th Cir. 2022) ("[i]t is the guideline's text, of course, that takes precedence, and so that is where we begin. And in doing so, if possible, we will give a guideline's text 'its plain meaning'") (internal citations omitted).

To determine whether an aggravating role enhancement applies in § 3B1.1, the Court must first consult § 1B1.3. "The 'Relevant Conduct' section of the Guidelines, § 1B1.3, counsels that 'adjustments in Chapter Three, shall be determined on the basis of the following':

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a *jointly undertaken criminal activity* (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were --
>
> (i) within the scope of the *jointly undertaken criminal activity*,
>
> (ii) in furtherance of that *criminal activity*, and
>
> (iii) reasonably foreseeable in connection with that *criminal activity*;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]"

*United States v. Bright*, 125 F.4th 97, 101 (4th Cir. 2025) (citing U.S.S.G. § 1B1.3(a)(1)(A)–(B) (emphasis added)).

"In order to determine the defendant's accountability for the conduct of others under subsection [1B1.3](a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)." *Id.* at 101-02 (citing U.S.S.G. § 1B1.3 cmt. n.3(B)). "Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." § 1B1.3 cmt. n.3(B). The commentary to § 1B1.3 echoes U.S.S.G. § 3B1.1, both using the phrase "criminal activity."

"Jointly undertaken criminal activity" is much narrower than *Pinkerton* liability, i.e., being "held vicariously liable for the acts of his co-conspirators so long as those acts are within the scope of the conspiracy as a whole and reasonably foreseeable to the defendant." *United States v. Evans*, 90 F.4th 257, 262 (4th Cir. 2024). "[T]he Guidelines have adopted a different and narrower principle of accountability." *Evans*, 90 F.4th at 262-63 (citing U.S.S.G. § 1B1.3, cmt. n.1 (distinguishing "sentencing accountability" from "criminal liability" with respect to the acts of others)). "Only acts of co-conspirators that fall within 'the scope of the criminal activity the *particular* defendant agreed to jointly undertake' – as opposed to 'the scope of the *entire* conspiracy' – count as relevant conduct under the Sentencing Guidelines." *Id.* (citing § 1B1.3, cmt. n.3(B) (emphasis added in original)). Therefore, "participants" in the overall conspiracy are not necessarily "participants" in the defendant's "jointly undertaken criminal activity" for the purposes of a § 3B1.1 aggravating role enhancement. U.S.S.G. § 3B1.1, cmt. n.1.

**I. A three to four-level increase for aggravating role should not apply because the "jointly undertaken criminal activity" did not involve five or more participants and was not "otherwise extensive"**

Mr. Nayandin objects to his aggravating role enhancement as "organizer or leader" of a "criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). *See* PSR, ¶ 59. For the reasons detailed below, Mr. Nayandin's conduct does not warrant an aggravating role enhancement. However, even assuming *arguendo* that Mr. Nayandin's role in the offense made him somehow more culpable than the "average participant," he should receive no more than a two-level enhancement under U.S.S.G. § 3B1.1(c).

At the outset, Mr. Nayandin wants to make clear to the Court and the Government that he does not dispute the Statement of Facts (SOF) or his Plea Agreement. Mr. Nayandin accepts full responsibility for his conduct in the SOF. Indeed, § 3E1.1 makes clear that making an objection to the Guidelines does not diminish his acceptance of responsibility:

> …a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. *This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt* (*e.g.*, to make a constitutional challenge to a statute or a challenge to the *applicability of a statute to his conduct*).

U.S.S.G §3E1.1, cmt. n.2 (emphasis added). Given that Mr. Nayandin did not exercise his right to trial (which the Commission states does not preclude acceptance) and is only challenging the applicability of § 3B1.1(a)-(b) to his conduct, nothing here should detract from his acceptance of responsibility.

Mr. Nayandin pleaded guilty to a conspiracy to knowingly and willfully violate 50 U.S.C. § 4819(a)(2)(F) of the Export Control Reform Act (ECRA). Subsection (a)(2)(F) defines a fairly narrow "criminal activity." As stated succinctly in the SOF:

> NAYANDIN, ELEVIEW, and BORISENKO conspired with each other and with others to violate ECRA and the EAR, by knowingly and willfully making false and misleading representations, statements, or certifications, and falsely concealing material facts directly and indirectly through other persons in connection with the preparation, submission, issuance, use, or maintenance of any export control document or any report filed or required to be filed pursuant to the EAR.

See ECF #65, ¶ 7. Eleview submitted these export control documents, via Mr. Nayandin and Mr. Borisenko, to freight forwarders and the DOC in relation to Eleview's export business. The Government primarily points to Eleview's SLI submissions to freight forwarders, of which Mr. Nayandin and Mr. Borisenko were solely responsible. *See* SOF, ¶¶ 15, 21, 23, 25. No other participants were involved with completing the SLIs or submitting them on Eleview's behalf.

No evidence has been presented that anyone besides Mr. Nayandin and Mr. Borisenko participated in this criminal activity.[3] This makes sense. No other Eleview employees have been charged or implicated in the export violations that took place. Further, no freight forwarders were implicated and there is no evidence that any of them knew Eleview's SLI documentation was incorrect. Moreover, there is no evidence that freight forwarders outside the United States had any intent to violate U.S. export controls; they simply want to continue their shipping activities with as little disruption as

[3] Eleview is a noted co-conspirator but is wholly owned by Mr. Nayandin so it will not be discussed in regard to an additional "participant."

possible. Therefore, this "criminal activity" did not involve five or more participants and was not otherwise extensive. It involved only two, Mr. Nayandin and Mr. Borisenko.

The Government requested that the PSR writer include paragraphs 50 through 57 of the draft PSR in support of this enhancement. A review of these paragraphs does not support the view that RTC, Turkish Locomotive Company (TLC), NAG Kazakhstan (NAG-K), Finnish Freight Forwarder (FFF), or Kazakh Shipping Service (KSS) (collectively "the Freight Forwarders) had "jointly undertaken" Mr. Nayandin's and Mr. Borisenko's "criminal activity."

Eleview had done business with RTC for a very long time, over a decade before the Russia sanctions went into effect, as well as some of RTC's subsidiary companies. An email from an RTC employee on February 25, 2022 indicated that RTC "want[ed] to try a test shipment with the new itinerary, via air" to NAG-K, a subsidiary of RTC. A "test shipment" was not unusual if Eleview had not previously shipped to that subsidiary, nor does this email exchange indicate that employees of RTC had "jointly undertaken" the particular "criminal activity" at issue. Although the Government points out that Mr. Borisenko requested the name "NAG" be removed the paperwork, PSR ¶ 51, he received the following response from an employee of RTC on March 5, 2022 at 8:46 a.m.: "No." This does not support RTC's participation in the "criminal activity." Rather, the employee's refusal to remove "NAG" shows quite the opposite.

Mr. Nayandin's April 4, 2022 email conversation with employees of RTC where they discussed the length of their business relationship with NAG-K, a subsidiary of RTC, is a closer call. When asked about the time period during which Eleview "had a business

relationship" with NAG-K for purposes of DOC paperwork, Mr. Nayandin arbitrarily, and unwisely, chose one year, when they had not previously shipped to NAG-K. However, the decision was Mr. Nayandin's alone and employees of RTC deferred completely to Mr. Nayandin. In other words, if Mr. Nayandin had instructed RTC employees to put "0" for the length of their business relationship, they would have done as requested, evincing an intent to simply comply with Mr. Nayandin's input.

More importantly, a single email exchange with RTC employees on a single occasion would not turn the other Freight Forwarders into participants in Mr. Nayandin's "criminal activity" of incorrectly completing SLIs. There is no evidence of any such communications with TLC, NAG-K, FFF, or KSS, or that any of those entities jointly undertook to make false and misleading representations and statements in export control documents or reports. Even if RTC was included with Mr. Nayandin and Mr. Borisenko, there are still less than five participants in the criminal activity in this matter.

For these same reasons, the "criminal activity" in this matter was not "otherwise extensive." The same limitations from U.S.S.G. § 1B1.3 apply. The Court must evaluate whether "the scope of the criminal activity the *particular* defendant agreed to jointly undertake" was "otherwise extensive." *Bright*, 125 F.4th at 101-02 (emphasis in original). Based upon the foregoing arguments, the "joint criminal activity" was essentially limited to Mr. Nayandin and Mr. Borisenko, certainly not five or more participants, and was not otherwise extensive.

## II. Mr. Nayandin was not an organizer, leader, manager, or supervisor of the "criminal activity" in this matter

Mr. Nayandin should not receive an enhancement pursuant to § 3B1.1. USSG § 3B1.1(c) provides for a two-level increase "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity ...." Application Note 2 to this guideline makes clear that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG § 3B1.1, cmt. n.2; *see United States v. Hodge,* 295 F. App'x 597, 603 (4th Cir. 2008).

In determining whether a defendant possessed a leadership or organizational role over the "criminal activity," the sentencing commission had indicated that a sentencing court should consider seven factors: "[1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others." *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002) (citing U.S.S.G. § 3B1.1, cmt. n.4).

The Government has presented no evidence that Mr. Nayandin exercised this role over the "criminal activity" in this matter. This means more than being the CEO of Eleview and managing the property, assets, and cash at issue in the company's export business. *United States v. Llamas*, 599 F.3d 381, 390 (4th Cir. 2010) ("the key inquiry is whether the defendant's role was that of "an organizer or leader of people," as opposed

to that of a manager over the property, assets, or activities of a criminal organization.”). “In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).” U.S.S.G. § 3B1.1, cmt. n. background.

To be sure, Mr. Nayandin had some decision making authority in the “criminal activity,” but he recruited no one, participated in the same ways as Mr. Borisenko, did not claim a larger share of the fruits of the criminal activity, and did not exercise substantial control or authority over the other participant, Mr. Borisenko. Mr. Nayandin exercised no control or authority over the Freight Forwarders by simply providing them with shipping instructions, or SLIs. The Government has no specific evidence to distinguish Mr. Nayandin from the “average participant” besides his title as “CEO.” As evident from the SOF, the government consistently refers to all three charged co-conspirators as equals:

> 5. NAYANDIN and BORISENKO have each been in the export business for many years and have knowledge and understanding of U.S. export laws, including that the export of items subject to item-based controls, or to certain prohibited end-users, or for certain prohibited end-uses, are unlawful unless an exporter first obtains an export license. …
>
> 6. During the conspiracy and during the conduct described herein, NAY ANDIN and BORISENKO were working as employees and agents of ELEVIEW within the scope of their employment and intended their actions at least in part to benefit ELEVIEW.
>
> 7. Despite their knowledge of their obligations under ECRA and the EAR, including the EAR Russia Sanctions, NAYANDIN, ELEVIEW, and BORISENKO conspired with each other and with others to violate ECRA and the EAR.

ECF #65 (SOF), p. 2.

The SOF does not contain any information regarding Mr. Nayandin "provid[ing] guidance and direction to his employee, co-conspirator Vitaliy Borisenko, [or] Eleview's business partners," nor have these facts been proven during the pendency of this case. *See* PSR ¶ 59. Aside from the single email exchange with RTC regarding the length of their business relationship, discussed above, there is no evidence that Mr. Nayandin provided guidance or direction to any other participants of the "criminal activity" in this case. Therefore, the enhancement pursuant to U.S.S.G. § 3B1.1 should not apply.

Mr. Nayandin should qualify as a zero-point offender

If Mr. Nayandin does not receive an adjustment for aggravating role, then his offense level should be decreased by two levels (-2) for being a zero-point offender. U.S.S.G. § 4C1.1.

## ARGUMENT ON SENTENCING FACTORS

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise. While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences. *See*

*United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009). A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

When considering the factors enumerated in § 3553(a), which state that a judge must "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007). A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to victims. 18 U.S.C. § 3553(a). The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to § 3553(a). *Id.*

**<u>Mr. Nayandin's Personal History and Characteristics</u>**

Mr. Nayandin was born in 1970 in the former Soviet Union, in the area now known as Kazakhstan. He was born in the eastern most portion of Kazakhstan near the Russian border with Mongolia. Mr. Nayandin was raised in Kazakhstan by his parents, Yuriy and Valentina, and he had one younger sister, Natalia. They had modest means but were educated. His father was an electrical engineer and his mother was an accountant and civil engineer. Below is a picture of Mr. Nayandin at age two with his parents.

[redacted]

Mr. Nayandin remembers having a good childhood and his parents being able to provide for his basic needs. He grew up having a good relationship with his parents and his younger sister, and a very curious mind.

In 1987, when Mr. Nayandin turned 17-years-old, he had demonstrated enough proficiency with his studies to obtain admittance to Tomsk Polytechnic University in Tomsk, Russia, about 600 miles north of his hometown. He would remain in Tomsk for six to seven years working on his degree and beginning an advanced degree. Mr.

Nayandin was very much a "nerd," fascinated with science and technology.

[redacted] [redacted]

In February 1994, Mr. Nayandin was awarded the qualification of an "Engineer & Physicist," with specialization in "Nuclear Reactors and Nuclear Power Installations." At the same time, Mr. Nayandin started a family when he married his long-time girlfriend, Tatyana.

[redacted]

After Tomsk, Mr. Nayandin traveled to the United States for further educational opportunities. He and his wife moved to Michigan so he could pursue his doctorate degree from Western Michigan University (WMU). Mr. Nayandin was a good student. Through his coursework at WMU, Mr. Nayandin also took advantage of opportunities to do research at the Advanced Light Source at the Lawrence Berkley National Laboratory, University of California at Berkeley:

[redacted] [redacted]

It was a very busy time for Mr. Nayandin, both academically and personally. He had just started his Ph.D. program, he had been married not too long beforehand, and the couple was expecting their first child in 1997, Mr. Nayandin's son, Dennis:

[redacted] [redacted]

He defended his dissertation and graduated with his Ph.D. from WMU in 2001. After that, Mr. Nayandin moved to Virginia, where he has lived ever since.

Mr. Nayandin made his life and his home in Virginia. He raised his son in Virginia, began his company, Eleview, in Virginia, and found his community here as well. He became a U.S. citizen in 2014. Mr. Nayandin has lived in the United States and Virginia for almost half of his life and he raised his son here. He is extremely engrained

in his personal and business communities, having profound impacts on many people as is readily apparent from his character letters. His friend Mr. Alex Gordiyenko, another local business owner states:

> I have only positive things to say about his character, kindness, being hard worker, dedicated father, husband, morality, and honesty. I have not experienced a single instance of improper business or dishonest practice from Oleg. … Oleg Nayandin I know is a person that can be relied on, regardless of circumstances, a true friend, great family man and an honest person who learns from mistakes, and outworks just about anyone I know. I truly believe that Oleg's ability to better himself and learn from the errors made.

*Character Ltrs* (CL), p.5.

For another local business owner, Mr. Nayandin's assistance was absolutely critical to get his business up and running. Mr. Kong describes Mr. Nayandin as the only local business willing to work with him on his limited, startup budget:

> Looking back, I am not sure I could have completed that project without him. If that dream project had failed, I would have suffered unbearable financial losses and my chance at the American Dream. …
> I know Oleg has accepted responsibility for his actions. and I respect the law. However, I want to share what Oleg is capable of doing for society. He has a rare ability to help small business owners succeed.

CL, p.7. Another local business owner, Mr. Maguire, who also operates under the U.S. export controls, said this case was very out of character for Oleg:

> In my experience, Mr. Nayandin has been deeply committed to his family and to building a stable, productive life. He has consistently demonstrated responsibility, focus, and care for those around him. Our conversations over the years-often centered on the challenges of running small businesses and supporting families-reflected a person who took those responsibilities seriously.

CL, p.22.

Mr. Nayandin's impact is no less profound on his neighbors and friends. A family

friend, Ms. Huang, has known Mr. Nayandin for over ten years. She states:

> Based on my long-standing relationship with Oleg and my direct experiences with him, I firmly believe he is a person of strong moral character, compassion, and responsibility. He has been candid, kind, and consistently willing to help others. I believe he is a fundamentally good person who made a serious mistake, but who also has the capacity to learn from it and rebuild his life in a positive way. I respectfully ask the Court to consider his character, his devotion to his family, and his long history of contributing to those around him. I truly believe he deserves a second chance.

CL, p. 32. Another family friend, Mr. Livis, stresses that Mr. Nayandin takes his obligations, which includes this matter, very seriously and he always tries to make improvements in his life:

> From everything I have observed over the past twenty years, Oleg is a person who takes his obligations seriously and works hard to do the right thing. I know that he fully understands the seriousness of this situation, and I believe he is committed to learning from it and moving forward in a positive and responsible way. Oleg has always been someone who strives to improve himself and support those around him., and I am confident that he will continue to contribute positively to his family, his community, and his professional environment.

CL, p.10. Letter after letter establishes that Mr. Nayandin has consistently displayed good character to all those who have come into contact with him.

Considering that this is a national security case, it is also noteworthy that five retired military officers wrote character letters for Mr. Nayandin. Lieutenant Colonel Rod Wade, U.S. Army (retired), stated that he actually spoke to Mr. Nayandin about his efforts to become compliant and that Mr. Nayandin retained a law firm to help with Eleview's compliance efforts. CL, p.24. Lieutenant Colonel Charles Hale believes strongly in Mr. Nayandin's rehabilitative potential:

> Based on my 10 years of observation I believe Oleg has strong

> rehabilitative potential and will be an even more productive member of the community because of this experience. I have not observed any behavior by Oleg which makes me concerned for a need to protect society from him. I have been impressed that he has kept his business going despite the stress of the situation. It is my hope that this conviction alone will serve as a deterrence to others and serve as sufficient punishment for Oleg.

CL, p.6. Many of these former military leaders know a thing or two about leadership and teamwork and they have high opinions of Mr. Nayandin, even in the context of a national security offense. Mr. Nayandin loves ice hockey and he has known and interacted with these men and women for years through community hockey leagues and other community activities.

[redacted] [redacted]

He has met their children and they have met his son. Their opinions are well-founded. Mr. Nayandin's love of ice hockey, and perhaps of science and technology, appeared to have rubbed off on his son. He currently works as a software engineer for Capital One after obtaining his education. Before the events of this case, Mr. Nayandin was truly living the American Dream.

**<u>The Nature and Circumstances of the Offenses</u>**

The Russia sanctions ushered in a new day. Mr. Nayandin tried to keep up with

the changing regulations. The licensing process in 2022 to 2023 was extremely complicated, unlike anything Mr. Nayandin had encountered before, and he fell short in his ability to understand. Mr. Nayandin, and Eleview, were not as proficient with figuring out the export controls as the Government would have the Court believe. In fact, it was so complicated, and the chances of actually obtaining licenses from the DOC appeared so unlikely, that Eleview consciously decided to not attempt to export items requiring licenses. If a customer ordered an item that required a license, i.e., a controlled item, Eleview would not ship it.[4]

To be clear, Mr. Nayandin does not ship weapons, or ammunition, or body armor; things one might expect to be useful in a war. He ships consumer products, e.g., clothes, toys, books, small electronics, shoes, etc. Determining whether a license was required from the former category was obvious and easy; however, determining whether a laptop, a microscope, or an ethernet cable needed a license was a much more complicated endeavor. Even the U.S. Government had difficulty determining whether licenses were

[4] "[I]f a shipment to Russia occurred after April 8, 2022, and any good in that shipment had an ECCN, then the exporter was required to get a license for each good with an ECCN before it could be exported to Russia." *Gov. Sentencing Position*, p. 4. Eleview attempted to only deal with items not on the commerce control list (CCL) with no ECCN.

required for certain products involved in this case, needing expert assistance.[5] *See* ECF #57. The Government's "outreach" did not help Eleview learn to navigate the EAR any better. It was more of a reminder than outreach or assistance, which of course is fine-–it was Eleview's responsibility. But Eleview did reach out the agent on several occasions attempting to get some assistance with its questions. For example, after one of its shipments was stopped in error, the agent emailed Mr. Borisenko:

> On Fri, Jun 3, 2022 at 10:40 AM Christopher Silva <christopher.silva@bis.doc.gov> wrote:
>
> The two shipments that are detained at Polaris both have items that require an ECCN contained in them. When we met during our outreach event on March 30th you indicated that you had an intimate knowledge of the export laws and regulations. You stated that you understood how to check if something requires a license or not to go to a specific country or a specific entity. You also indicated that everything that you send is EAR 99 goods which is not the case.
>
> If you want your packages to not be stopped in the future you should put the correct ECCNs in the filing paperwork and if the items require an exception or a license to be sent somewhere you should also include that in the paperwork. If you would like to get more in depth on this topic feel free to give me a call. At this point I cannot speak to the packages that are detained at JFK. I will get back to you once I have more information on those.
>
> Chris Silva
>
> Special Agent

That shipment was subsequently released because the items did not need a license, i.e., they were EAR99. However, the next time Mr. Borisenko had a question, he contacted the agent as the agent had suggested:

[5] The Government began investigating Eleview in 2022, raided their warehouse on June 21, 2023, and indicted the defendants on February 27, 2025. On July 30, 2025, by letter, the Government informed the defendants that "a license determination related to Counts Five and Ten of the Indictment [had been made] … Counts Five and Ten are premised on the export of a radiofrequency amplifier on or about August 17, 2022. ECF No. 27 at 14-15. During expert witness preparation, we identified an issue with the date that the radiofrequency amplifier became controlled and the date of export. The radiofrequency amplifier became controlled on or about September 15, 2022, when the Department of Commerce added HTS Code 854233 to Supplement 4 to Part 746 (15 C.F.R. § 746.5). Prior to September 15, 2022, the radiofrequency amplifier did not require a license to be exported to Russia."

**Christopher Silva** <christopher.silva@bis.doc.gov> Thu, Jun 16, 2022 at 10:33 AM
To: Vitaliy Borisenko <vit@eleview.com>
Cc: Oleg Nayandin <oleg@eleview.com>, Francisco Da Costa <francisco@eleview.com>

Vitaliy,

Hope you are doing well. As discussed in previous emails I do not have the ability to say rather a specific item can go to a specific country. If you could not find the information you were looking for through Snap-R I suggest that you call Exporter Services 202-482-4811. They should be able to help you out with any questions that you have.

Have a nice day,

Chris Silva

Special Agent

They were having trouble figuring out which items were covered by an ECCN and could not seem to get pointed in the right direction. The agent suggested the SNAP-R website but they typically got responses such as this:

| | |
|---|---|
| Reference Number | 1000235 |
| Request: | Hello Oleg,<br><br>Please contact CISCO for the ECCN determination for the listed item. You may also visit CISCO's Website and search their export control page for items that have been reviewed or self-classified by CISCO. I a returning this application without action. |

Figuring out what items were permitted to be shipped to what location was simply much more complicated than the Government makes it out. Therefore, Eleview simply tried to figure it out, which was a bad decision. They eventually hired a law firm for assistance at great expense, but the shipments had already been sent. As stated, Eleview did not intend to send any controlled items, so these were not "schemes," as the Government refers to them. They were simply shipping routes, each of which will be discussed in turn.

<u>Shipments to the Turkish Locomotive Company (TLC)</u>

Eleview had a long-standing, business relationship with RTC, a company which

was founded in Russia in 2004, over ten years after Mr. Nayandin left the university in Tomsk. Mr. Nayandin was generally aware that RTC was a large company and that it had many divisions and business relationships inside of Russia. He had no knowledge of any connections to Russian government agencies and the Government has presented no evidence to show otherwise. The Government claims this relationship is apparent from "open source" information, but counsel was able to find no such information. For Eleview, RTC was just one of its customers.

When the sanctions went into effect, Eleview did not stop shipping to RTC. They attempted a shipment on August 16, 2022, discussed above. *Supra*, SLI, p.6. Since Eleview did not plan to ship controlled items, there was no reason to stop. At the same time, RTC indicated that it was working with TLC on a project in Kazakhstan. RTC referred Eleview to TLC because TLC needed to place several orders. Mr. Nayandin was open to this alternative but wanted to receive assurances that TLC would not be transshipping to RTC. Mr. Nayandin did in fact receive those assurances from TLC and that is part of the reason he agreed to send the shipments, although he admits there were red flags.

In the statement of facts, Mr. Nayandin agreed that this was precisely what happened in this case. He "disregarded red flags," and by doing so, he remained "deliberately ignorant" as to the CUDs for the shipments, and "deliberately avoided" knowing if the UCs were in Russia. But the Government goes too far. They argue that Eleview exported "hundreds of items of telecommunications equipment to Russia." *Gov. Sentencing Position*, § IV.B. However, the Government provides absolutely zero evidence

to support this assertion and cites no evidence. All we know for sure is that the shipments went to Turkey. Eleview may have ignored red flags that these items might be transshipped to Russia, but there is no evidence regarding how many or what portion of the items actually were sent to Russia. The Government simply makes this assumption.

The Government cites no evidence or authorities to prove that any, or how many, of Eleview's shipments to TLC were actually transshipped to Russia. Throughout the Government's section IV.B, it cites nothing to support its assertions, in stark contrast to the rest of its brief. Additionally, the Government argues that the "telecommunications equipment" shipped to TLC has an "array of potential applications, including use by consumers or use by militaries to create and expand communication networks." These are blanket statements without any support. Eleview shipped network switches that have consumer applications, not military applications. There has been no evidence presented that any of the consumer electronics that Eleview shipped would benefit the military, or that have practical military applications. The Government claims that Eleview shipped items with "significant military uses," but they explain none of them.

Shipments to the Finnish Freight Forwarder (FFF)

Mr. Nayandin takes complete responsibility for the inaccuracies in the SLIs for the shipments going to FFF. He would like to state that Eleview had shipped to Russian customers via the Russian Post[6] location in Finland for years. It was an efficient and cost-effective way to ship goods, cheaper than shipping directly to Moscow. Historically,

[6] The national postal service of Russia.

Eleview would list Russia as the CUD. The reason this changed after the sanctions became effective is because Eleview was advised for logistical reasons, even for products NOT requiring licenses, that it was extremely difficult to find an air routes directly to Russia because of the war. The airspace was very heavily regulated. Mr. Nayandin also initially misunderstood the UC procedures. Eleview did this in error on several occasions before they became clear that this was not acceptable. This was wrong and Mr. Nayandin made sure to correct this practice.

For the relevant time period, Eleview shipped the following product categories via the FFF:

| **Product Category** | **Total Quantity** | **Percentage of All Shipments (%)** |
|---|---|---|
| Health, Beauty & Personal Care | 54,799 | 29.29 |
| Apparel & Textiles | 48,371 | 25.86 |
| Electronics & Computers | 20,539 | 10.98 |
| Footwear & Headgear | 15,235 | 8.14 |
| Toys, Games & Sports Equipment | 14,593 | 7.8 |
| Books, Stationery & Office Supplies | 6,347 | 3.39 |
| Home, Kitchen & Furniture | 5,576 | 2.98 |
| Jewelry, Watches & Accessories | 5,461 | 2.92 |
| Art, Collectibles & Hobby | 3,510 | 1.88 |
| Tools & Hardware | 3,325 | 1.78 |
| Automotive & Motorcycle Parts | 3,302 | 1.77 |
| Food & Beverages | 3,200 | 1.71 |
| Bags, Luggage & Leather Goods | 1,224 | 0.65 |
| Baby & Children Products | 577 | 0.31 |
| Photography & Cameras | 536 | 0.29 |
| Pet Supplies & Animal Products | 316 | 0.17 |
| Other | 162 | 0.09 |
| Total | 187,073 | 100.01 |

Over fifty percent of Eleview's shipments contained health and beauty items, or clothing and textile products. Less than 11% of the shipments were for electronics.

In all of these shipments, the Government alleges that Mr. Nayandin shipped one, single "ethernet transceiver," which is the "*exact type* of ethernet transceiver has been found on the battlefield in Ukraine as part of a Russian suicide drone." *Gov. Sentencing Brief*, p.15. The Government attempts to overstate the harm. There is no evidence that anything Eleview shipped has aided the Russian military. The Government's argument is meant to inflame the Court's passions and it improperly equates speculative risk with actual harm.

Additionally, these transceivers are much more likely to be found in factory automation, industrial robots, medical devices, network switches, or security cameras. Mr. Nayandin readily admits that he SLI submissions were inaccurate, but those inaccuracies were unrelated to the EAR.

<u>Shipments to the Kazakh Shipping Service (KSS)</u>

Eleview had been shipping products to Kazakhstan for many years. Many of the products shipped there were meant for Kazakh customers, but some were bound for Russia as well. There were a portion of customers in Russia who preferred receiving shipments via Kazakhstan because they would arrive quicker and at a lower cost. Products shipped directly to Russia experienced delays and increased fees. Over the relevant time period, Eleview shipped the follow product categories to Kazakhstan:

| **Category** | **Items** | **Percentage** |
|---|---|---|
| Auto Parts | 35022 | 76.6 |
| Clothing | 3301 | 7.2 |

| | | |
|---|---|---|
| Electronic Components | 1358 | 3 |
| Health & Beauty | 1247 | 2.7 |
| Consumer Electronics | 1172 | 2.6 |
| Network Electronics | 741 | 1.6 |
| Quilting & Sewing | 632 | 1.4 |
| Miscellaneous | 559 | 1.2 |
| Vitamins & Supplements | 322 | 0.7 |
| Tools & Hardware | 293 | 0.6 |
| Footwear | 235 | 0.5 |
| Jewelry & Watches | 229 | 0.5 |
| Home & Garden | 215 | 0.5 |
| Marine Parts | 153 | 0.3 |
| Sports & Outdoors | 102 | 0.2 |
| Bags & Luggage | 67 | 0.1 |
| Food & Beverages | 53 | 0.1 |
| Toys & Games | 22 | 0 |
| Office Supplies | 6 | 0 |

Network electronics accounted for less than 2% of all shipments during the offense period. In the 1300 or so electronic components that were shipped during the relevant time period, the Government has alleges that two oscilloscopes were shipped in violation of the EAR. It is unlikely that these two items were integral to the Russian war effort.

**<u>The Need for the Sentence Imposed</u>**

The entire pendency of this case has been extremely stressful for Mr. Nayandin, his family, and his business. The Government's decisional process after the search of Eleview's warehouse lasted an exorbitantly long time, almost 20 months, before they indicted him. During this period, Mr. Nayandin felt his life and business were paralyzed. However, he pushed forward the best he could. He set out to fix the export problems that Eleview was having and he seems to have done before the end of 2023. Eleview has been shipping without issue since that time, which is fairly impressive considering the

extra scrutiny they receive from DOC. Eleview had largely self-corrected all of their deficiencies prior to the time they were indicted. Mr. Nayandin hopes the Court will recognize that he has spent considerable time and expense to become and remain compliant with export controls.

If this Court imposed a sentence of probation, that does not mean Mr. Nayandin goes without punishment: "[p]robation is not an act of leniency. Probation is a substantial restriction of freedom; it is not forgiveness, and it is not an endorsement of the offense." *United States v. Myers*, 353 F. Supp. 2d 1026, 1032 (S.D. Iowa 2005) (citation omitted). It is "[i]nherent in the very nature of probation [] that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (citations and internal quotations omitted); *See also Gall v. United States*, 552 U.S. 38, 48 n.4 (2007); ("Probation is not granted out of a spirit of leniency. . . . As the Wickersham Commission said, probation is not merely 'letting an offender off easily'") (citing Advisory Council of Judges of National Council on Crime and Delinquency, *Guides for Sentencing* 13-14 (1957)).

Perhaps the biggest reason that a sentence of incarceration is not necessary is because the Government and DOC do not believe it is necessary, based on their agreement with Eleview. Based on the charges in this matter, the primary danger Mr. Nayandin posed to the public was via his export business. The Government and DOC have allowed his export business to remain in operation during the course of this case, even after his plea of guilty, and Eleview will continue to remain in business after sentencing, subject to certain DOC requirements. This is an implicit recognition that

Eleview was a legitimate export business that perhaps had some bad business practices at one point that have been remedied. The DOC agreed to allow Eleview to continue to export while serving its three-year suspension. A probationary sentence permits Mr. Nayandin to continue to salvage his company and try to get back to profitability for its employees and their families.

The remaining punishment factors can also be achieved with a sentence of probation or home confinement. Pursuant to the sentencing statute, Mr. Nayandin's sentence should be designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). A felony conviction, a sentence of probation, three years of supervised release, and a three-year withheld suspension of Mr. Nayandin's export privileges will certainly reflect the seriousness of his offense.

Regarding deterrence, Mr. Nayandin is now a convicted felon, who owns a company with a tarnished reputation, which has largely been debanked and may not survive. For the past year, Mr. Nayandin has spent considerable personal resources towards his business to try to remain solvent. With respect to specific deterrence, Mr. Nayandin has tried to express to this Court the remorse and embarrassment he feels and what he has learned from all of this. He will also address the Court directly at his sentencing hearing on this issue. Moreover, almost all of his 26 character letters testify that Mr. Nayandin has clearly learned from this event and there is no chance that he

would commit further offenses.

Under the circumstances of this case, a sentence of probation will promote Mr. Nayandin's respect for the law and provide a just punishment. Incarceration is not necessary to send this message. Moreover, the research shows that lengthier prison sentences do not prevent recidivism. "[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). "Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* (2010).[7]

Even the Sentencing Commission itself acknowledged this fact. "There is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing*

[7] Available at https://webpage.pace.edu/jhumbach/Crim-SentencingProject%20ReportonDeterrence.pdf (last accessed March 8, 2023).

*Guidelines* at 15 (2004). And perhaps most notably, the Department of Justice has tacitly acknowledged this fact: "[C]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects." Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999).

In accordance with § 3353(a), a sentence of probation is sufficient, but not greater than necessary, to reflect the seriousness of the case and achieve the Court's goals of specific and general deterrence. The Government's recommendation is entirely too severe. The Government mentions the possibility of supporting the "Russian war effort" several times. First, Mr. Nayandin must admit that in the realm of possibilities, it is possible. Second, the Government has provided the Court with absolutely zero evidence that this *actually* occurred. Third, since Eleview chose not to ship controlled items, the amount of controlled items that may have been shipped in error is likely very low. Yet, the Government askes the Court to sentence Mr. Nayandin on the perceived harm of helping the "war effort." That is a bridge too far. That is almost like sentencing someone for vehicular manslaughter when they commit a DUI offense. Mr. Nayandin sincerely understands the potential harm of his actions and he is very, very sorry. He will be remorseful forever—the Court may not believe that but it is true. This Court should not sentence him based on the Government's speculation. Incarceration is simply not necessary in this case. Therefore, for all of these reasons, Mr. Nayandin asks the Court to consider imposing a sentence of probation.

However, if the Court decides incarceration is warranted, a sentence of home confinement can still accomplish the Court's objectives. That would allow Mr. Nayandin to continue to attempt to save his export business and the positions of his employees. He could also continue to care for his wife and family personally, emotionally, and financially.

**The Kinds of Sentences Available**

Although not the sentencing range recommend by the Guidelines, a sentence of probation is authorized under the statute of conviction in this matter. PSR, ¶ 99. Home confinement can be added as a condition of probation. U.S.S.G. § 5F1.2. The Court can also opt for a longer period of supervised release. In this case, the Court can sentence Mr. Nayandin to a maximum of three years of supervised release. PSR, ¶ 99, p. 22. The Court may also assess a fine of up to $250,000 and a $100 special assessment. Mr. Nayandin humbly requests that the Court not assess a fine in this matter, as the family has already suffered a substantial financial penalty in terms of their loss of income and significant legal costs. Should Eleview cease operations, Mr. Nayandin will be personally liable for an SBA loan with a balance of almost half a million dollars. Any fine or monetary penalties are appropriate handled via Eleview's disposition.

**The Sentencing Guidelines & Policy Statements**

The Sentencing Guidelines range should be viewed critically against Mr. Nayandin's actual conduct and the range is severely overstated. After considering the harm done and Mr. Nayandin's admitted conduct, a downward variance in this case is warranted. Defense counsel asserts that the range is at an inflated level for the nature of

Mr. Nayandin's offense, which involved the shipping of consumer products. A much lower sentence is appropriate considering all of the sentencing factors in § 3553(a).

Mr. Nayandin received a base offense level of 26 because he evaded "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons," otherwise he would have received a base offense level 14. U.S.S.G. § 2M5.1. Again, Mr. Nayandin had been shipping consumer products to Russia for almost 20 years without violating any export controls. But since the 2022 controls were put in place for national security reasons, those guidelines apply. Some other offenses that would carry a base 26 offense level, or lower, in Part M are:

- Destruction of National Defense Material, Premises, or Utilities (**26**), § 2M2.3;
- Unauthorized Disclosure to a Foreign Government or a Communist Organization of Classified Information by Government Employee (**24**), §2M3.3;
- Tampering with Restricted Data Concerning Atomic Energy (**24**), § 2M3.5;
- Disclosure of Information Identifying a Covert Agent (**25**), § 2M3.9;
- Exportation of Arms, Munitions, or Military Equipment Without Required Validated Export License (**26**), § 2M5.2; or
- Providing Material Support or Resources to Designated Foreign Terrorist Organizations (**26**), § 2M5.3.

It is a strange application of the Guidelines where Mr. Nayandin, for shipping Cisco network switches and an oscilloscope, gets the same base offense level as someone who provided material support to terrorists, shipped guns to the Russian army without a license, or knowingly disclosed classified information to a foreign government. For these reasons, Mr. Nayandin's base offense level seems to overstate the wrongfulness of his conduct.

Furthermore, Mr. Nayandin has zero criminal history points. Regardless of whether he receives a reduction as a zero-point offender, the U.S. Sentencing

Commission and Congress have made substantial amendments to portions of the Guidelines applicable to this class of defendants.[8] The Commission added new Guideline section 4C1.1, under Chapter 4—Criminal History, which provides for the *decrease* of two offense levels if the defendant meets all of the required criteria. U.S.S.G. § 4C1.1; *see also* U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines, Retroactive Application, pp. 1-2 (Aug. 31, 2023) (explaining that the amendments to the Guidelines recognize the fact that "*individuals with zero criminal history points have considerably lower recidivism rates than other sentenced individuals*") (emphasis added).[9] Indeed, underpinning its rationale for drafting § 4C1.1, the Sentencing Commission stated that "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal history points ("zero-point" offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines—Preliminary, pg. 71-72 (April 5, 2023).[10]

**<u>The Need to Avoid Unwanted Disparities</u>**

Mr. Nayandin, through counsel's research, was able to locate some cases dealing

[8] Counsel raises the recent U.S.S.G. Amendments in furtherance of Mr. Nayandin's argument for a variant sentence. Given that the Sentencing Commission has seen fit to change how the guidelines apply to individuals with no criminal history points (such as Mr. Nayandin) through new § 4C1.1 and § 5C1.1 App. n.10(B)—explicitly making the recommended Guidelines Sentences for this class of individuals more lenient across the board—the requested variant sentence in Mr. Nayandin's case is all the more warranted.

[9] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf.

[10] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

violations of 18 U.S.C. § 554 and 50 U.S.C. § 4819. These cases generally deal with two classes of defendants, those who ship weapons and weapons related materials, and those who ship other products. The cases are that similar to Mr. Nayandin's behavior and culpability pertain to those cases not involving weapons. Upon a survey of those cases, Mr. Nayandin argues that his circumstances are most similar to the facts of *United States v. Grigorev*, *United States v. Horath*, and *United States v. Orencel*. *See* Chart below. *Grigorev* and *Horath* are arguably more culpable than Mr. Nayandin because they sold non-weapon materials directly to Russian government entities. Additionally, *Grigorev* sold directly to a Russian drone maker and *Horvath* sold military grade radios. Each of these cases supports that a probationary sentence is reasonable for Mr. Nayandin.

Other than those cases, several other cases dealing with the illegal export of weapons are listed below:

| Case | Offense(s) | Description | Sentence |
|---|---|---|---|
| *US v. Grigorev* 1:23-cr-00429 E.D.N.Y. 2025 | 18 USC § 371 18 USC § 554 | Defendant intentionally circumvented export controls to export tens of thousands of electronic components, without a license, to a Russian drone maker. | 4 years of probation, $150,000 fine, $100 SA |
| *US v. Pinto Serrano* 1:25-cr-00175 E.D. Va. 2025 | 18 USC § 554 | Defendant illegally exported at least 3,000 rounds of AK-47 ammunition and planned to export five rifles, including AR-15, to his home country which has been plagued for years by gun violence. | 48 months, 3 years SR, $100 SA |
| *US v. Eugene* 1:25-cr-00078 D.D.C. 2025 | 18 U.S.C. § 554 | Defendant knowingly shipped two vehicles to Haiti containing firearms and ammunition which were hidden. | 30 months, 2 years SR, $20,000 fine, $100 SA |
| *US v. Horvath* 1:24-cr-00401 D.D.C. 2025 | 18 U.S.C. § 371 18 U.S.C. § 554 | Defendant knowingly attempted to sell 200 long-range, two-way radios with secure, encrypted capabilities directly to Russian governmental entities. | 31 months, 3 years SR, $5,000 fine, $100 SA |
| *US v. Aguilera* 1:24-cr-00012 E.D. Va. 2024 | 18 U.S.C. § 554 | Defendant organized the straw purchasing of firearms, concealed them in used cars, and sent them to a drug trafficker in South America for eventual use by the PCC, a large Brazilian gang and drug trafficking organization. | 48 months, 3 years SR, $100 SA |
| *US v. Bjarnason* 1:24-cr-00096 D. Md. 2024 | 18 U.S.C. § 554 | Defendant attempted to export eight firearms and hundreds of rounds of ammunition to Iceland. | Time served ~ 3 months, |

| | | | |
|---|---|---|---|
| | | | No term SR, $100 SA |
| *US v. Coker* 1:22-cr-00317 D. Md. 2023 | 50 USC § 4819 18 U.S.C. § 554 | Defendant illegally shipped as many as 81 firearms to Ghana without a license. | 30 months, 2 years SR, $100 SA |
| *US v. Orencel* 1:20-cr-00270 D. Md. 2022 | 18 USC § 554 | Defendant attempted to export a controlled fission chamber, used in nuclear reactors, from NY to Honk Kong, after DOC agents visited him to review the exports rules and regulations. | 6 months, 1 year SR, $5000 Fine, $100 SA |
| *US v. Altamimi* 1:20-cr-00208 E.D. Va. 2020 | 18 USC § 554 | Defendant illegally shipped approximately 45 rifle barrels to the UAE without a license. | 2 years of probation, $100 SA |
| *US v. Rodriguez* 1:19-cr-00153 E.D. Va. 2019 | 22 USC § 2278 18 USC § 554 | Defendant illegally shipped approximately 27 firearms and ammunition for resale in Honduras without a license. | 18 months, 3 years SR, $100 SA |
| *US v. Challenger* 3:16-cr-00130 E.D. Va. 2018 | 18 USC § 554 18 USC § 924 | Defendant illegally shipped two firearms and ammunition to Antigua without a license. | 6 months, 3 years SR, $100 SA |

Mr. Nayandin was primarily shipping shoes, shirts, and shampoo. Mr. Nayandin is certainly less culpable than anyone who illegally exports weapons and ammunition to bad actors. His case is also different than defendants who were shipping directly to Russian government entities. He was trying to run his business in a very challenging environment. This Court should consider the benefits of keeping Mr. Nayandin in the community versus the highly reduced need for incarceration in this case.

## CONCLUSION

At the end of the day, Mr. Nayandin wants to the Court to know that he is very sorry. In the last two and a half years, he set out to fix his company's export compliance and accept responsibility for his actions in this case. Mr. Nayandin hopes the Court can see his tremendous efforts to do both. He respectfully requests that the Court impose a variant sentence of probation, or alternatively, to sentence him to a term of confinement to be served on home confinement.

Respectfully submitted,
OLEG NAYANDIN
By Counsel

__________/s/__________________
Yancey Ellis (VSB 70970)
Counsel for Defendant
108 N. Alfred Street, First Floor
Alexandria, Virginia 22314
703.684.7908
yancey@carmichaellegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2026, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

__________/s/__________________
Yancey Ellis